[No. 8273.    Department Two.    January 8, 1910.]

GEORGE McDONNELL, *Appellant*, v. COEUR D'ALENE LUMBER COMPANY, *Respondent*.[1]

CONTRACTS—ASSENT—PRELIMINARY NEGOTIATIONS—ORAL PROMISE FOR WRITTEN CONTRACT. An oral contract made in July, for the logging of certain land at an agreed price per thousand, the work to commence about September following, and which fixed the place of delivery and time of payment, is not a completed contract so as to be binding until it was reduced to writing, where it was understood that the same was to be reduced to writing wherein the details should be stated, which writing should be executed upon the return of one of the parties from a brief trip (DUNBAR, J., and RUDKIN, C. J., dissenting).

SAME—ACTIONS—ISSUES AND PROOF — PLEADINGS — AMENDMENTS. Where plaintiffs were orally promised a written contract for the logging of land, and moved their outfit preparatory to the work in reliance thereon before any contract was made, upon failure of the action for breach of the contract to log, in which there was no offer

[1]Reported in 106 Pac. 135.

to amend or proof of any damage by reason of the moving of the outfit, the complaint should not be treated as amended on appeal or the judgment of dismissal reversed to allow a recovery for damages.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered May 23, 1907, upon the verdict of a jury rendered in favor of the defendant by direction of the court, in an action upon a logging contract. Affirmed.

*C. P. Lund, W. T. Stoll*, and *Edwin McBee*, for appellant, cited: *Blight v. Ashley*, Fed. Case No. 1,541; *Nash v. Kreling* (Cal.), 56 Pac. 262; *Wharton v. Stoutenburgh*, 35 N. J. Eq. 266; *Sanders v. Pottlizer Bros. Fruit Co.*, 144 N. Y. 209, 39 N. E. 75, 43 Am. St. 757, 29 L. R. A. 431; *Pratt v. Hudson River R. Co.*, 21 N. Y. 305; *Blaney & Morgan v. Hoke*, 14 Ohio St. 292; *Paige v. Fullerton Woolen Co.*, 27 Vt. 485; *Lawrence v. Milwaukee, L. S. & W. R. Co.*, 84 Wis. 427, 54 N. W. 797; *Bell v. Offut*, 10 Bush (Ky.) 632; *Montague v. Weil & Bro.*, 30 La. Ann. 50; *Cheney v. Eastern Trans. Line*, 59 Md. 557.

*Wakefield & Witherspoon* and *E. P. Twohy*, for respondent, cited: 1 Page, Contracts, p. 41; *Sibley v. Felton*, 156 Mass. 273, 31 N. E. 10; *Mattoon Mfg. Co. v. Oshkosh Mut. Fire Ins. Co.*, 69 Wis. 564, 35 N. W. 12; *Schenectady Stove Co. v. Holbrook*, 101 N. Y. 45, 4 N. E. 4; *Bissinger v. Prince*, 117 Ala. 480, 23 South. 67.

MOUNT, J.—The appellant brought this action to recover damages against the respondent for the breach of an alleged contract. At the close of the plaintiff's evidence, the trial court sustained a motion for a directed verdict, and dismissed the action. The plaintiff appeals.

The facts as shown by the evidence are, in substance, as follows: In the year 1905 the respondent was engaged in the lumber business, at Coeur d'Alene, Idaho. The appellant and one Anthony Shea were copartners in the logging

business. In July of 1905, the appellant and Anthony Shea went from Spokane to Coeur d'Alene to look for a logging contract. They called upon the respondent company, and were informed that that company desired some logging done in that season on Santa creek, which was a branch of the St. Mary's river, in Idaho, where respondent company owned some timber land. Appellant and Mr. Shea thereupon went into the woods and examined the timber, and returned to the office of the respondent company at Coeur d'Alene, where they met and talked with Mr. Newton and Mr. Carroll, officers of the respondent company. The appellant relates this conversation as follows:

"Mr. Carroll asked us if we found anything that suited us, and we told him that we did, but we didn't care to have anything to do with 13 as it was too large. . . . We told him that we did not even care to log all of 23 as our outfit wasn't large enough for that amount of timber. They said they didn't know whether they would care to let a portion of a section or not at that time. We talked it over a couple of days or so and they discussed it with us. We were there a couple of days and had conversations about every day with Mr. Carroll in regard to the conditions. And so we talked over the conditions and several things and finally he said he had decided pretty near what he would do. So that evening he said he was going to Missoula, and we met him and Mr. Newton on the street. He was going to take the electric car down this way and go to Missoula. And he said to us again —he asked us what we wanted to do. We said we were ready to get out the south side of Santa creek any time he desired to let it out. He asked us what we would put the south side in for, delivered in the St. Mary's river, drive it and log it, and Mr. Shea spoke up and said four dollars per thousand. So he turned to Mr. Newton and said, 'I guess that's all right. I guess it will all right to let that to the boys.' I said, 'We want to be certain about it. We want to know whether we are going to get it or not.' He said, 'I will tell you what we are going to do. Mr. Newton and I will talk it over between now and the time the train goes, and we will decide then just what we will do. You boys call around at the

office in the morning and Mr. Newton will let you know just what we will do about the matter.' Mr. Newton was alone in the office and he held us for a moment. I believe he said he was waiting for Mr. Smith. Just then Mr. Smith came in and he called him into the private office and said, 'Mr. Carroll and I talked this matter over this evening and decided to let these boys have the south side of 23.' He asked Mr. Smith what he thought about it and he mentioned the price of four dollars delivered in the St. Mary's river. Mr. Smith said he considered that a fair bargain; that they were getting it done reasonably enough, and at the same time we should be able to make some money out of it ourselves. Mr. Newton said, 'Yes, that is what we figured it would be," and he turned to us and said, 'You can consider the contract yours.' We told him that our outfit was at Leavenworth, Washington, and that there were several pieces of timber we were thinking about logging, and we did not want to let those go and go to the trouble of getting our outfit unless we were positive of the contract. 'Why,' he said, 'the contract is yours. Go ahead and log it. I would give you a written contract but I prefer to have you wait until Mr. Carroll comes back to arrange the details in regard to the payments. I didn't go over that with him, that is, the payments'; and we told him we didn't care enough about them as we were positive the contract was ours. And he said, 'It is yours. Go ahead and get at it.' "

Mr. Smith, above referred to, testified in substance the same as above, and that Mr. Newton said to appellant and to Mr. Shea that, "they would have to wait until Mr. Carroll got back and that they would arrange the details." Mr. Shea testified in regard to the contract in substance the same as above, and also that he understood that when Mr. Carroll came back a written contract would be entered into. This all occurred in July, 1905. No written contract was entered into. The appellant and Mr. Shea never performed the contract nor entered upon the work, but in the early part of September, 1905, they again went to Coeur d'Alene and were then informed that the respondent had let a contract to other parties, and refused to permit the appellant and Mr. Shea to enter upon the work. The appellant and Shea had

in the meantime brought their teams and outfit from Leaven-
worth to Spokane for the purpose of entering upon the work.
Mr. Shea assigned his interest in the contract to the appellant,
who brought this action to recover the sum of $4,000 dam-
ages alleged to be the profits which the appellant would have
made on the contract.

It is apparent from the statements hereinbefore made and
from the reading of the evidence in the case that no binding,
completed contract was ever entered into.   The main fea-
tures of the contract were agreed upon and the appellant
and his partner were informed that the contract was theirs;
that they could go ahead and log it.   This was said in July,
and it was understood that the work was not to be commenced
until the following September.   The appellant's evidence
clearly showed that the details of the contract were not ar-
ranged, and the contract itself was to be reduced to writing
and the details were to be stated therein.   This was never done.
At most the parties were negotiating upon the terms of the
agreement to be entered into between them.   They had agreed
upon the main questions. viz., the land to be logged, the price
per thousand, and the place of delivery and time of payment,
and about the time the work was to begin, and also that the
contract should be reduced to writing wherein the details
should be stated.   But while these features had been agreed
upon, they had not passed the stage of negotiations, because
they had not been reduced to writing as the parties con-
templated.   The rule in such cases is stated in 9 Cyc. 280, as
follows:

"Where parties are merely negotiating as to the terms of
an agreement to be entered into between them, there is no
meeting of minds while such agreement is incomplete.   Thus,
where they intend that their verbal negotiations shall be re-
duced to writing as the evidence of the terms of their agree-
ment, there is nothing binding on them until the writing is
executed."

See, also, Clark, Elementary Law, pp. 167-8; Clark, Con-
tracts (Hornbook series), p. 62.   Under this rule it is ap-

parent that no binding contract was proven, which could be enforced or which could be made the basis of an action for damages.

It is argued that, inasmuch as the appellant had brought his teams from Leavenworth to Spokane, Washington, preparatory to going to Coeur d'Alene and entering upon the work, the complaint should be treated as amended here so as to permit a recovery for damages caused thereby. There was no offer to amend the complaint in this respect at the trial, and there is no evidence in the record that the appellant suffered damages on account of bringing his "outfit" from Leavenworth to Spokane. All the evidence is that the "outfit" was brought to Spokane about the 1st of September, 1905, preparatory to entering upon the work. This evidence was admitted over the respondent's objection. But it does not necessarily show that the appellant was damaged.

There is no error in the record, and the judgment must therefore be affirmed.

CROW and PARKER, JJ., concur.

DUNBAR, J. (dissenting)—I am unable to reach the conclusion announced in the foregoing opinion. I think there was a complete agreement which both the parties intended to be an agreement, and that it was therefore binding. There can be no question of the correctness of the rule cited in the majority opinion from 9 Cyc. 280, but in my judgment it has no application to the facts of this case. The same authority, in the latter part of the same section, on page 282, continuing, says:

"On the other hand, an agreement to make and execute a certain written agreement, the terms of which are mutually understood and agreed upon, is in all respects as valid and obligatory as the written contract itself would be if executed. If therefore it appears that the minds of the parties have met, that a proposition for a contract has been made by one party and accepted by the other, that the terms of this contract are in all respects definitely understood and agreed

upon, and that a part of the mutual understanding is that a written contract embodying these terms shall be drawn and executed by the respective parties, this is an obligatory agreement."

The case of *Hodges v. Sublett*, 91 Ala. 588, 8 South. 800, is cited by the author to sustain both announcements, and does consistently sustain them both, for there it was held that, when a contract is not by law required to be in writing, the parties may verbally agree on all the terms, their mutual assent making a complete contract, in which case a subsequent suggestion or agreement that the contract should be reduced to writing does not make the writing essential to the validity and completeness of the contract. Said the court:

"It is an elementary principle, that the mutual assent of the parties to the same thing, and in the same sense, is an essential element of every contract. When the parties orally agree upon the terms of the contract, and there is a final assent thereto, so that no variation can be introduced into the writing except by mutual consent, the mere suggestion or intention to put it in writing at a subsequent time is not, of itself, sufficient to show that they did not mean the parol contract to be complete and binding without being put in writing."

Clark on Contracts (Hornbook series), page 62, cited by the majority opinion, simply announces the well-established rule as follows:

"Where the parties are merely settling the terms of an agreement into which they propose to enter after all its particulars are adjusted, the negotiations do not amount to an agreement. . . . So, also, if the parties come to an agreement as to terms, but with the intention and upon the understanding that their agreement is to be reduced to writing, and that they are not to be bound until this is done, there is no contract until the writing is drawn up and assented to by both as their agreement. It all depends on the intention of the parties. If they come to a final agreement as to terms, it may bind them, though they intend to reduce the terms into writing for the purpose of becoming bound in a more

formal manner, or for the purpose of preserving a memorial of the terms, or for any purposes other than that of making the writing exclusively their agreement. The question is whether they intend legal consequences before the formal written evidence of their agreement is excuted. If they do not, there is no contract until this is done; but if they do intend to be bound without regard to the writing, there is a contract. Whether they intend to make no agreement until the writing is drawn up, or whether they intend to make a perfect agreement to be afterwards reduced into writing, is a question of fact."

Accepting this statement of the law as controlling, can it be said that it appears from the testimony that it was intended that the oral contract should not be binding, when it was so plainly evinced by what was said by the appellant, viz., that their solicitude was concerning the binding quality of the contract, so much so that they waived condition of payment, satisfied to do the work and receive the pay when it was done in order that they might have the assurance that they could rely on the contract being theirs; and this was well understood by Mr. Newton, who said, with reference to the contract and in answer to the statement of the appellant that they had the opportunity to take other contracts which they did not want to give up unless they were sure of getting the one in question, and that they did not want to move their outfits from Leavenworth, Washington, to the St. Mary's river in Idaho unless they were certain of the contract: "The contract is yours; go ahead and log it?" Surely this was not an agreement to enter into an agreement, but was itself an agreement, and was so understood by the parties making it. Being such an agreement, it was enforcible, and I therefore am compelled to dissent from the opinion above expressed.

RUDKIN, C. J., concurs with DUNBAR, J.