[No. 11049.   Department Two.   December 1, 1913.]

## HUGO V. LOEWI, *Appellant*, v. CHARLES W. LONG *et al.*, *Respondents.*[1]

SALES—REQUISITES—CORRESPONDENCE—EXECUTION OF SUBSEQUENT FORMAL CONTRACT. A contract for the sale of a hop crop is consummated by letters and telegrams, although the parties had in mind the subsequent signing of a more formal contract, where it appears (a) that the subject-matter had been agreed upon, (b) the terms were all stated in the informal writings, and (c) the parties intended a binding agreement prior to the execution of the formal contract.

[1]Reported in 136 Pac. 673.

SALES—OFFER AND ACCEPTANCE—CONSUMMATED AGREEMENT—EVI-DENCE—SUFFICIENCY. That the subject-matter of a sale of hops was fully agreed upon in letters and telegrams and that the parties intended a binding agreement prior to the execution of a formal contract, is established where there was no dispute as to the subject-matter, the offer to buy at thirty cents was accepted, provided the seller made a certain immediate payment by telegram and a subsequent advance, and the payments were forwarded as stipulated prior to the time for the execution of the formal contract.

SALES—TERMS—TIME AND PLACE OF DELIVERY—CUSTOM. The fact that letters and telegrams constituting a sale of hops did not fix the time and place for delivery is immaterial, where the court found, without exception taken, that, by the custom of the trade, where no specific agreement was made therefor, delivery was to be at the nearest railway station on or before the last day of October.

SAME—TERMS—TIME FOR PAYMENT. Where a contract for the sale of hops did not fix the time for the payment of the balance due after two preliminary advances, the rule of law is that delivery and payment of the price shall be concurrent acts.

SALES—BREACH BY SELLER—DEFENSES—TITLE. One contracting for the sale and delivery of a certain crop of hops cannot escape liability for damages from breach of the contract by showing that he did not own the hops.

SALES—BREACH—MEASURE OF DAMAGES. On the breach of a contract to deliver 25,000 pounds of hops at the price of 30 cents per pound, at a time when the market price was forty cents, the purchaser is entitled to recover as damages the sum of $2,500.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered September 19, 1912, upon findings in favor of the defendants, in an action on contract, tried to the court. Reversed.

*E. P. Whiting*, for appellant.

*Bevington & Redden* and *C. B. Egan*, for respondents.

MAIN, J.—The purpose of this action was to recover damages for the breach of a contract for the sale of hops.

On or about August 5, 1911, one Robert M. Livesley, residing at North Yakima, Washington, and engaged in the business of buying and selling hops as the plaintiff's agent, re-

ceived an unsigned letter sent from Brooks, Alberta, Canada, dated July 31, 1911. This letter Livesley understood to be from Charles W. Long, one of the defendants. The letter was in fact written by one of Mr. Long's sons, but had the father's endorsement. No question is raised as to the authenticity of the letter. This letter, among other things, stated:

"We are holding our hops for 28 cents and if you can do anything at that price I would like for you to handle them; let me know how the market is."

This letter Livesley on August 5, 1911, replied to by wire as follows.

"North Yakima, Aug. 5, 1911.

"Charles Long, Brooks, Alberta, Canada. Letter received; like your crop at twenty-eight but wont take advantage; thirty is talked and some bought; will give thirty and advance you five cents Sept. first for what you wish to sell and if you answer at once will call the trade closed. Robert Livesley."

Thereafter, and on August 9th, Long wired as follows:

"Brooks, Alberta, Aug. 9 via North Yakima, Wn. Aug. 10, 1911.

"Mr. Robert Livesley, care Frye Hotel, Seattle, Wn. Will accept your offer providing you wire me one thousand dollars down and two thousand five hundred the first of September. You can have all the crop except twelve thousand five hundred pounds which McNeff gets there. Will be twenty or twenty-five tons. Answer. C. W. Long."

This telegram was received by Livesley in Seattle, and on August 11th he sent the following:

"Seattle, Aug. 11-11.

"Chas. Long, Brooks, Alberta, Canada. Accept your hop crop for nineteen eleven at thirty cents as per you offer by wire. Will I send contract and one thousand dollars to you at Brooks? Answer. Robert Livesley."

On August 14, Livesley caused the Bank of California, located at Seattle, to wire the Union Bank at Brooks one thousand dollars for the credit of C. W. Long. After this had

been done, and later during the same day, Livesley received from Long the following telegram:

"Brooks, Alberta, via North Yakima, Wn. Aug. 14, 1911.

"Robert Livesley, Hotel Frye, Seattle, Wn. Send contract. Wire one thousand to Merchants bank, Brooks, Alta. C. W. Long."

In reply to this, Livesley wired as follows:

"Seattle, Aug. 14, 1911.

"C. W. Long, Brooks, Alberta, Canada. Have wired you one thousand bank at Brooks. Will send you contract tomorrow for your signature. Robert Livesley."

On August 15th, Long received from his son, Otis, the following telegram:

"Chehalis, Wn. Aug. 15.

"C. W. Long, Brooks, Alta. Sold to Klaber for forty cents. Otis Long."

Livesley prepared a contract, using the usual form of "Hop Contract," signed the same, and on August 16th forwarded it to Long at Brooks for signature. The contract was never signed by Long or returned. On August 17th, Long sent to Livesley a telegram as follows:

"Brooks, Alb., 17, via North Yakima, Wn., Aug. 17, 1911.

"Robert Livesley, care Frye Hotel, Seattle, Wn. Received wire late. Otis sold hops; will wire money back. C. W. Long."

On August 23rd, Livesley wired Long as follows:

"North Yakima, Aug. 23, 1911.

"Chas. W. Long, Brooks, Alberta, Canada. Have you sent contract. If not, do so at once otherwise will have to take action per Loewi's instructions. Wire me at once. Robert Livesley."

On August 31st, $2,500 was sent to the Union Bank of Brooks to be placed to the credit of C. W. Long, the same being the amount of the second advancement called for by the telegram of Long under date of August 9th. The Union Bank of Brooks promptly notified Long of the receipt of

each advancement, which was placed to his credit. Long, however, refused to accept the money.

The hops in question were grown in Lewis county, this state, during the season of 1911, upon a farm formerly owned by Charles Long, but during the season leased by the then owner to Otis Long. The defendants having failed and refused to deliver the hops to the plaintiff or his agent, on December 18, 1911, the present action was instituted, claiming damages in the sum of $4,817.50 for breach of contract. The cause was tried to the court without a jury. The court found that the hop crop raised on the farm leased to Otis Long during the year 1911 amounted to about 25,000 pounds in excess of the 12,500 pounds sold to one McNeff and that the value of these hops delivered at the railway station f. o. b. on the 31st day of October, 1911, was forty cents per pound. In his telegram of August 9th to Livesley, a copy of which appears above, Charles W. Long stated: "You can have all the crop except twelve thousand five hundred pounds which McNeff gets." Judgment was entered for the defendants. The plaintiff appeals.

The question is whether or not the correspondence above set out establishes a contractual relation between the parties. To determine whether or not a contractual relation has been established by informal writings, such as letters and telegrams, where the parties have in mind the subsequent signing of a formal written contract, it is necessary to inquire, (a) whether the subject-matter has been agreed upon, (b) whether the terms are all stated in the informal writings, and (c) whether the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract. If the subject-matter is not in dispute, the terms are agreed upon, and the intention of the parties plain, then a contract exists between them by virtue of the informal writings, even though they may contemplate that a more formal contract shall be subsequently executed and delivered. *Sanders v. Pottlitzer Bros. Fruit Co.*, 144 N. Y. 209, 39 N. E. 75, 43 Am. St. 757,

29 L. R. A. 431; *Blaney v. Hoke*, 14 Ohio St. 292; 1 Beach, Modern Law of Contracts, § 3; *International Harvester Co. of America v. Campbell*, 43 Tex. Civ. App. 421, 96 S. W. 93; *Green v. Cole*, 103 Mo. 70. In the case last cited, the law is stated in this language:

"It is a well settled principle of law that to constitute a contract the minds of the parties must assent to the same thing in the same sense. There must be a mutual assent to all of the propositions; for so long as any matter forming an element of the contract is left open, the contract is not complete. Though the terms of the contract may all be agreed upon, still if the parties make it a condition to the existence of a contract that the terms agreed upon be reduced to writing and signed by them, there is no contract until this is done. 1 Addison on Contracts (Morgan's Ed.), p. 37. On the other hand, it is well-settled law that, where the parties have assented to all the terms of the contract, the mere reference to a future contract in writing does not negative the existence of a present contract. In other words if the parties make an agreement which they intend shall be binding from the time it is made, effect will be given to it from that time, though they intend it shall be superseded by a more formal written agreement."

Applying this rule of law to the facts in the present case, and considering first the matter of the intention of the parties as evidenced by the letter and telegrams, it would appear obvious that they intended by the correspondence to establish a contractual relation. For had not Mr. Long intended this to be the effect, why did he wire requesting that one thousand dollars be sent him prior to the time that the written contract could be signed. This would seem to make it plain that he then thought the contract existed and intended to be bound thereby. As a rule in business transactions, men do not expect or demand that a part of the purchase price of an article shall be paid when no contract for its sale and purchase exists. That it was the intention of Livesley that the informal writings should constitute a contract is made evident by the fact that the one thousand dollars was for-

warded prior to the preparation of the formal written contract.

There appears to be no dispute as to the subject-matter. But it is claimed that the formal written contract contained terms not found in the informal writings. Conceding for the present that this is the case, it would seem to be immaterial, in view of the fact that Long refused to comply prior to the time he had seen or knew the contents of the formal written contract. The reason which he gave in his telegram of August 15th for refusing to proceed further was that his son, Otis, had sold the hops. The fact that the time and place of delivery was specified in the formal contract but not mentioned in the telegrams, would not constitute additional terms, since the trial court made a finding which was not excepted to "that by the custom of the trade when no specific agreement therefor is made, hops are to be delivered at the railway station nearest to the place where raised on or before the 31st day of October." Neither does the fact that the informal writings do not fix the time when the balance of the purchase price shall be paid while the formal contract does, constitute the adding of an additional term. It is the rule that where the time of payment is not mentioned, then the law provides that the delivery of the article and the payment of the purchase price shall be concurrent acts. 2 Mechem, Sales, § 1407.

The respondent contends, further, that the law is that, where a formal written contract is to be subsequently signed, then no contractual relation can exist prior to its execution. In support of this position, two decisions from this court are cited, viz.: *McDonnell v. Coeur d'Alene Lumber Co.*, 56 Wash. 495, 106 Pac. 135, and *Stanton v. Dennis*, 64 Wash. 85, 116 Pac. 650. In the *McDonnell* case, oral negotiations had taken place between the parties relative to a logging contract. The court there held that the details of the contract had not been arranged and that the contract itself was to be reduced to writing and the details stated therein, which was never done.

That case may be distinguished from the present in this, that here all the essential terms of the contract were agreed upon and the parties intended that a contractual relation should exist prior to the time of the signing of the formal written contract; while there, as already stated, the details of the contract had not been arranged. In the *Stanton* case, the plaintiff's assignor, by letter, had submitted to the defendant a proposition relative to the furnishing of labor for the setting of mill work and doing the carpentry on an addition to a certain building. The letter provided: "formal contract to follow." After the word "accepted" which appeared below, the defendant had signed his name. In that case, it was held that it was the duty of the plaintiff's assignor to prepare and forward a formal written contract, which was never done. He being in default in this regard, the action could not be maintained. In the case cited, it does not appear that it was the intention of the parties that a contractual relation should exist prior to the subsequent execution of the contract. In the present case that intention is unequivocal. We think the court did not intend to hold in either of those cases that, under no circumstances, could a contractual relation exist by virtue of informal writings when it was provided that a subsequent formal contract was to be executed. To so hold would be not only to go counter to the views expressed by text writers and courts generally, but would place an unreasonable barrier in the way of the facility of business transactions.

Evidence was introduced for the purpose of showing that the hops in question were not the property of the defendant, Charles W. Long, but were owned by his son Otis. The ownership of the hops does not seem to us material. Even though they were owned by the son, if the father contracted for their sale and failed to deliver them, he would subject himself to liability in damages.

On the question of the amount of damages, it appears that the amount of hops sold and not delivered was 25,000 pounds. The contract price with Livesley was thirty cents. The hops

were sold to other parties for forty cents. The court found that the fair market value of hops in Lewis county on the 31st day of October was forty cents. Upon this showing, we think the plaintiff is entitled to a judgment in the sum of $2,500.

The cause will be reversed, and remanded with directions to the superior court to enter a judgment in favor of the plaintiff in the sum of $2,500.

CROW, C. J., ELLIS, and MORRIS, JJ., concur.