## G. H. LINDEKUGEL & SONS, INC., Appellant
### v.
## THE BREZINA CONSTRUCTION CO., INC., Respondent

(160 N.W.2d 121)

(File No. 10423.   Opinion filed July 18, 1963)

**Morgan & Fuller,** Mitchell, **Whiting, Lynn, Freiberg & Shultz,** Rapid City, for plaintiff and appellant.

**Bangs, McCullen, Butler & Foye,** Rapid City, for defendant and respondent.

BIEGELMEIER, Judge.

This is an action for breach of a subcontract plaintiff claimed it entered into with defendant. Both are engaged in heavy construction work. This action resulted from the proposed construction in North Dakota of an earthen dam faced with rock rip-rap

by the U.S. Army Engineers, the letting to be held June 15, 1965, at Omaha, Nebraska. Most of the negotiations were conducted between Marnel Lindekugel for plaintiff and Robert Brezina for defendant, the first of which were in the spring of 1965 when Lindekugel[1] called Brezina and expressed interest in the two companies submitting a joint venture bid. Lindekugel had prior rock rip-rap experience on other dams. After learning some North Dakota company had tied up the rock sources in that area, Lindekugel advised Brezina he was not in a position to give a competitive bid on the rock and so was not interested in the joint venture, but would give the best price it could as a prospective subcontractor. The two met at Omaha where they discussed the matter and Lindekugel orally gave Brezina some figures on the rip-rap and concrete work with the understanding he would give exact figures before noon the 15th. Brezina asked Lindekugel if he was bidding the rock to any other contractor, was advised he was not but was bidding exclusively with Brezina, whereupon Brezina said he would use Lindekugel's bid in his bidding. On the morning of the 15th Hamann, another employee of Lindekugel, at its direction submitted a handwritten exclusive or "closed" quote or bid as it is described in the briefs. It was dated June 15, 1965, was $200,000 more than the oral figure and Brezina over the telephone expressed his dissatisfaction with the figure without indicating Lindekugel would have the contract if the United States accepted Brezina's bid. This handwritten Lindekugel bid totaled $1,288,580; it included cement, steel and rock rip-rap. Defendant was the successful bidder; its contract with the United States contained a provision for "value engineering". The latter provision allowed a contractor to suggest different methods of performing the contract which, if approved, split the savings between the United States and the contractor.

On August 2, at Pierre, South Dakota, plaintiff's brief relates "Lindekugel prepared a subcontract for Brezina to sign according to the terms of his closed quote to Brezina." It was type-

---

1. Lindekugel sometimes refers to Marnel Lindekugel, an officer of defendant and at other times to the corporation, the text indicating its usage; Brezina is similarly used.

written and while dated June 15th was not in accord with the "closed" quote for it totaled $1,032,891.40 and omitted items 6 and 11 through 19. This Lindekugel proposal contained a signature line for acceptance by Brezina who refused to sign it as he was exploring use of soil cement for rock rip-rap under the value engineering clause.

On August 12th, George and Marnel Lindekugel met at Brezina's office in Rapid City, South Dakota, with a letter and a new quotation, offer or proposal #3 which, under the value engineering clause, used a soil cement method rather than rock rip-rap. It was dated August 12, 1965 and totaled $909,723.96. It also contained a place for Brezina's acceptance. Marnel Lindekugel testified he told Brezina they had brought three proposals with them to "try to * * * fit in with his proposal for value engineering with us doing the work * * * He (Brezina) said, well, he was not prepared, at that time, to sign anything". This testimony will be mentioned later.

By letter of September 17th Lindekugel notified Brezina it was preparing to send equipment to the project site in a few days. The Brezina reply dated September 23rd stated "We have no subcontract agreement with your organization * * * We reiterate that until such time as a subcontract is negotiated between us, if any, we can accept no obligation to you." On October 25th Lindekugel wrote Brezina "Since you deny that any agreement exists * * * we find it necessary as of this date to withdraw any offers made at the time of the letting, 15 June 1965 or any offers subsequent to that date."

Marnel Lindekugel testified he talked to Robert Brezina over the phone on October 26th and Brezina told him the Engineers had said the value engineering (soil cement method) was not acceptable which put him in poor shape. "I said, 'Maybe we can still work it out, if you would send me my contract,' and he said, * * * 'I would like to wait until I get it (engineer's official word) in writing.'" Lindekugel further testified Brezina called him on November 2nd saying "he would like to go ahead with the rock arrangement, and I said, 'Well, Bob,' I said,

'if you will send me a contract, we can go ahead with it,' and I said, 'I will withdraw my letter of the 25th.' (There was some discussion of bond costs) 'Bob, if that's all there is standing between us,' I said, 'include the deduct in the contract, and send me the subcontract, and I will sign it, and we will go to work,' and he said, 'It will be in the mail today.'" Lindekugel also testified he sent a letter to Brezina dated November 4th wherein he said "we are withdrawing our letter mailed to you on 25 October 1965. * * * we are willing to proceed with our original agreement. * * * We would, however, appreciate your subcontract on this matter at the very earliest". Defendant never signed or sent an acceptance of any of the subcontracts to plaintiff. The trial court directed a verdict for defendant and plaintiff appealed from the judgment thereon.

There seems to be some confusion of the issue or issues on appeal. Plaintiff's complaint contained two counts. Count One alleged the parties had entered into a contract on or before June 14, 1965 and this contract was breached by Brezina prior to October 25, 1965. Plaintiff at the trial introduced evidence that it was a custom in the contracting business in South Dakota that when a subcontractor gave a "closed" quote to a prime contractor, the latter would give the subcontract to the subcontractor at the figure quoted. Plaintiff-appellant's brief, under a title "Custom And Usage" quotes this testimony and then under Questions Presented By Assignments Of Error, Point I "first contends that a good and valid contract was entered into between the parties on the 15th day of June in Omaha upon the Defendant being awarded the prime contract", yet after referring to its later actions, the brief continues: "By the acts of these parties such contract was totally vitiated." Then under Point II plaintiff asserts "No one could possibly contend that either of the parties could have enforced the contract of the 15th (sometimes mentioned as the 14th) of June." Later argument is made however under Point III that the June 15th quote was a closed quote and under Point IV that it bound defendant. Defendant's contract with the United States also prevented the start of the embankment operations until July 1, 1966, more than a year later and defendant's answer included the defense of the Statute of Frauds.

The trial court mainly relied on this defense in directing the verdict for defendant. See SDC 10.0605(1) and Brown v. Wisconsin Granite Co., 47 S.D. 635, 201 N.W. 555. Plaintiff-appellant's brief is generally directed to the questions of the Statute of Frauds, part performance and custom and usage under Count One. However, in its Reply Brief plaintiff states "Lindekugel is not suing under the rescinded contract of June 14, rescinded on October 25, but is suing for breach of contract entered into on November 2, 1965." The appeal will be so considered and the ruling as to the custom and usage claim in Count One not reviewed by the opinion.

██    General principles applicable to the issue of whether the parties entered into a contract appear in Restatement, Contracts, § 26:

> "Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions as stated in § 25."

Comment under § 26 states:

> "On the other hand, if the preliminary agreement is incomplete, it being apparent that the determination of certain details is deferred until the writing is made out; or if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract."

This court has similarly said:

> "Whether an informal agreement, which is to be thereafter reduced to writing, takes effect as a complete contract at once or when it is so reduced to writing depends on the intention of the parties as construed from the facts and circumstances."

Larson v. Western Underwriters, Inc., 77 S.D. 157, 87 N.W.2d 883, and compare Federal Land Bank v. Houck, 68 S.D. 449, 463, 4 N.W.2d 213, 220; 17 Am.Jur.2d, Contracts, §§ 25, 28. One of the necessary inquiries to determine whether or not a contractual relation has been established by informal writings and negotiations is whether the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract. Plumbing Shop, Inc. v. Pitts, 67 Wash.2d 514, 408 P.2d 382, quoting from Loewi v. Long, 76 Wash. 480, 136 P. 673.

Lacking a valid contract under the June 14th—15th custom and usage theory the evidence to support the claim that a contract was entered on November 2, 1965 must be examined, guided by the above principles. There is no question the parties were negotiating and exploring the possibilities of doing some work on this project. The figures in plaintiff's handwritten memo dated June 15, 1965 stated it submitted "the following quotation for your consideration". The testimony of its witnesses referred to this as a closed "quote". The same word "quotation" appeared in the typed memo of August 2nd dated back to June 15, 1965.[2] One of the memos of August 12th, taking into consideration the value engineering section, requested acknowledgement of these "proposals", the other submitted a "quotation"[3] as did the August 17th memo. All of these memos (except the handwritten one on which plaintiff relied in its custom and usage count) had thereunder the words "Accepted By............................. Brezina Construction Company Date: ..............................".

■ Brezina's letter to Lindekugel of September 23rd stating categorically it had no contract agreement with it and until it was determined what changes, if any, were to be made,

---

2. An example under § 25, Restatement, Contracts, referred to in § 26 thereof is: "A writes to B, 'I can quote your flour at $5 a barrel in carload lots.' This is not an offer."

3. Marnel Lindekugel's testimony of these August 12th proposals was: "I was still endeavoring to get Mr. Brezina to make up the subcontract, so that we could proceed with actual work. * * * I said, 'why don't we joint venture? We can still make a joint venture.' * * * 'No,' * * * 'I've got the contract myself,' and he said, 'I'm going to keep it that way,' * * * I said, 'Why don't you sign these contracts' * * * because I gave him an alternative, if he wanted to do the concrete work, plus the rock, or the rock, only, or we had a proposal for a soil cement * * * he said, 'No, I won't sign anything' ". This shows not only the repeated requests for and denials of a contract in writing but uncertainty of mode of operations as well as the pricing feature, for which see Note 4.

"it would be foolish to attempt to make an agreement" and reiterating "until such time as a subcontract is negotiated between us, if any, we can accept no obligation to you" was abrupt and final. It caused Lindekugel by letter of October 25th to reply that since Brezina denied any agreement existed "we find it necessary as of this date to withdraw any offers made at the time of the letting, 15 June 1965 or any offers subsequent to that date." Lindekugel had a place for Brezina's signature to a typewritten acceptance on all the last four quotations and knew Brezina had not signed these and recognized no validity of any of them. These circumstances were notice to Lindekugel of Brezina's intention to require further negotiations and a written contract. Marnel Lindekugel's testimony of an October 26th phone conversation reflected his understanding of a written contract requirement when he advised Brezina " 'Maybe we can still work it out, if you would send me my contract,' "[4] and the last November 2nd phone conversation " 'Well, Bob,' I said, 'if you will send me a contract, we can go ahead with it * * * send me the subcontract, and I will sign it' ". Even the Lindekugel self-serving letter of November 4th stating "We would, however, appreciate your subcontract on this matter at the very earliest" confirms the intention of the parties that their negotiations result in a written contract signed by the parties. Bjornson v. Five Star Mfg. Co., 1953, N.D., 61 N.W.2d 913. Different totals appearing in some of the proposals, Lindekugel's October 25th letter stating it would be happy to discuss new pricing arrangements and Lindekugel's admission that, if his contention prevailed, Brezina could not avail itself of the value engineering clause of the U.S. contract without Lindekugel's consent, support the conclusion the parties did not intend to be bound by any contract until and unless it was reduced to writing and signed by the parties.

The trial court properly directed a verdict for defendant and the judgment is therefore affirmed.

---

4. Marnel Lindekugel testified that in his letter of October 25, 1965 "I was still trying to get Mr. Brezina to send me my contract." Also as to his request therein "to discuss a new pricing arrangement with you based on a changed working schedule that we would now be confronted with" he meant "Nothing specific" and "since I cancelled the contract, and if he wanted to reenter into a contract, then we would be open for negotiation for a new price."

ROBERTS, RENTTO and HOMEYER, JJ., concur.

HANSON, P. J., not participating.