IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 80642-4-I |
| | ) | |
| GINA RENEE GREEN, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | ORDER GRANTING MOTION |
| | ) | FOR RECONSIDERATION IN |
| v. | ) | PART, WITHDRAWING |
| | ) | OPINION, AND |
| THOMAS FREDERICK GREEN, | ) | SUBSTITUTING OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

The respondent, Gina R. Green, filed a motion for reconsideration for the opinion filed on March 2, 2020. The appellant filed a response. A majority of the panel having determined that the motion should be granted as to the award of attorney fees, and that the opinion filed on March 2, 2020 shall be withdrawn and a substitute unpublished opinion be filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration be, and the same is, hereby granted in part. It is further

ORDERED that the opinion filed on March 2, 2020 is withdrawn and a substitute unpublished opinion shall be filed.

FOR THE COURT:

_____
Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 80642-4-I |
| | ) | |
| GINA RENEE GREEN, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS FREDERICK GREEN, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Thomas Green appeals a superior court's order enforcing a property settlement agreement pursuant to Civil Rule 2A (CR 2A). Thomas[1] argues that the agreement did not accurately reflect the outcome of the parties' negotiations conducted by letter and email. Because Thomas raised a genuine issue of material fact as to the terms of the agreement, we reverse and remand for further proceedings.

## FACTS

Thomas and Gina Green married in 1991. Prior to and throughout their marriage, Thomas was employed by the Washington State Department of Transportation. Gina was responsible for raising the couple's two children. Later,

___

[1] For clarity, Thomas and Gina Green will be referred to individually by their first names. No disrespect is intended.

Gina worked as a paraeducator in the children's school and as a cashier in a gas station.

As a State employee, Thomas is entitled to retirement benefits through a Public Employee's Retirement System (PERS) pension plan (PERS 2). Thomas's pension plan accumulated $106,585.21 in assets during the marriage. The parties separated on November 13, 2016 and Gina filed a petition for dissolution. As of the date of separation, Thomas's estimated monthly PERS 2 retirement benefit was $3,350.87. The parties entered an agreed order awarding Gina maintenance in the amount of $ 2307.27 per month.

The court scheduled a settlement conference for May 9, 2017 and a trial date of June 13, 2017. Both parties appeared at the settlement conference, represented by counsel. In a letter to the commissioner conducting the settlement conference, Gina identified Thomas's PERS 2 account as one of the disputed assets. The letter states as follows:

Husband's PERS Plan 2

Tom enrolled in PERS Plan 2 on November 1, 1991, and is currently a vested member. The estimated marital benefit is $3350.87 per month (Exhibit 15). Gina would like 50% of this benefit by creating an interest in Tom's account for Gina. Gina would also like to be named the former spouse survivor beneficiary to ensure she receives her share of the retirement.

The parties were apparently unable to reach a settlement at the conference. Between May 31 and June 12, 2017, the parties continued to engage in written negotiations through their attorneys. On May 31, Gina's attorney sent Thomas's attorney a letter outlining a settlement offer. As for maintenance, Gina proposed

2

$2,327.58 per month for eight years and $1,000.00 per month for two years after that.  As for Thomas's retirement benefits, Gina stated as follows:

> On the chart you will see several "x" markings in the parties' columns, which warrant clarification. Gina proposes the parties equally divide the PERS II in addition to the notes made in the description column. Vanessa has contacted DRS to obtain the total monthly benefit payment the parties would divide for each of the three survivor benefit options: 50%, 66.67% and 100%. As soon I receive the information from DRS I will forward it to you with a proposal regarding how to address Gina's interest in the account and what survivor option she proposes, if any.

(Emphasis omitted).  Gina attached to the letter a chart detailing the Greens' assets and liabilities.  Under the section entitled "Investments and Other," Gina listed "PERS II Defined Benefit (Equally divide and create an Interest with Survivor Benefit) $3350.87/mo."  The chart lists the date of valuation as November 13, 2016.

Thomas's attorney responded in a letter dated June 7 containing "an offer of compromise."   Thomas agreed to a ten-year period of maintenance but proposed $1,600.00 per month for eight years and then $1,000.00 for an additional two years.

> In addition to Mr. Green being agreeable with Ms. Green receiving the family home he is agreeable with her creating an interest in his PERS 2 account and receiving the survivor benefit as requested as opposed to creating a separate account. As you are aware, under the "creating an interest" option Ms. Green would receive an increased amount of retirement pay when Mr. Green reaches retirement age if he remains with the state and continues to make the mandatory contributions to his pension. Mr. Green still has 20 years of work ahead of him and he has no intention of leaving his job. <u>If things go as planned Ms. Green would receive a benefit from the 20 years of post-divorce efforts of Mr. Green</u>, in addition to receiving the survivor benefit which Mr. Green could not then provide to any future spouse.

3

(Emphasis added).

At 2:51 p.m. on June 8, Gina's attorney responded by email as follows:

Thank you for the counter offer. This email contains a counter-offer Gina has authorized me to make in response to the counter you sent me yesterday.
. . . .
Gina is [willing] to accept $2300/month in spousal maintenance for five years, then $1800 for three years and $1000 for two years. She cannot take less now. She has no ability to earn a higher income and take less maintenance until she is educated and trained.
. . . .
As for retirement, Gina proposes a 100% survivor benefit. In the event your client returns to work and monthly retirement benefits are suspended as a result, your client will need to pay Gina spousal maintenance during the suspension time in a monthly amount equivalent to what she will be losing in maintenance due to the suspension.

She is willing to pay her own fees if we have an agreement.

I am forwarding you by separate email the DRS survivor benefit breakdown for your review.

At 5:02 p.m. on June 8, Thomas's attorney responded to the counteroffer:

Mr. Green is agreeable with your counter offer except that he proposes maintenance be paid at a rate of $2,000 per month for 5 years, $1,800 per month for 3 years and $1,000 per month for an additional 2 years. He has agreed to the requested disproportionate division of the property, to creating an interest in his retirement instead of creating a separate account and to the 100% survivor benefit for your client. Each of those things are a benefit only to Ms. Green while they are a detriment to Mr. Green.

If Ms. Green is agreeable with the above proposal this matter can be settled and we can all enjoy our weekend a bit more. Let me know.

At 10:44 a.m. on June 9, Thomas's attorney sent a second email:

I am writing to supplement the last counter-offer I sent over last night. Part of the rationale in proposing the $2,000 for 5 years has to do with the mandatory contribution Mr. Green must make to his PERS 2 account. I understand the position taken at settlement conference. However, in light of my client's agreement to create an interest in his

account and to allow for the 100% survivor benefit, <u>Ms. Green will receive just as much benefit as Mr. Green from any future contributions/withholdings</u>. Additionally, he has no control over the deduction. As such, we feel it really should be factored into the deductions from his income.

Further, maintenance in the amount of $2,000 per month would cover your client's need according to the financial declaration submitted at settlement conference, which includes a premium for health insurance, $100 going into savings and $150+/- that she is paying toward the daughter's vehicle loan and insurance that should arguably be paid by the daughter.

Finally, we feel the court would come in around 8 years for the duration of maintenance if the matter went to trial so if were [sic] are able to settle matters Mr. Green would be agreeing to two years of maintenance beyond what we believe is a likely outcome at trial.

In any event I wanted to expand on the rationale submitted last night. Hopefully we can get this thing wrapped up today.

(Emphasis added).

At 6:42 p.m. that same day, Gina's attorney responded via email that she was willing to accept Thomas's June 9 counteroffer on three conditions, two of which are relevant here.[2]

2. In the event Mr. Green leaves state employment for any reason within the next 60 months, he will pay Gina within 60 days of ending employment with the state the amount of $18,000, which is the amount she is foregoing in spousal maintenance ($2300 - $2000 = $300 x 60 months) in reliance on your client's assertion that he will remain an employee of the state and have a mandatory retirement contribution from which Gina will benefit and which reduces his ability to pay her $2300 per month in current maintenance for five years.

3. Mr. Green agrees not to take a lump sum withdrawal from his state retirement upon termination from employment for any reason. He must agree that the parties will receive monthly benefits and not a lump sum.

If your client will agree to these conditions, we have a deal.

---

[2] The other involved a tax refund that is not relevant to this appeal.

At 9:52 a.m. on June 12, Thomas's attorney responded with another counteroffer:

As to Condition #2, Mr. Green does not intend to leave employment with the state anytime in the next 5 years but he cannot predict the future. At the same time he is cognizant of your client's concern. To more fairly address that situation he proposes that the $18,000.00 be divided by 60 months which comes out to $300 and that in the event he leaves employment with the state during the next 5 years he would owe a lump sum equaling $300 x (60 – the number of months he worked after entry of the decree). Additionally, he proposes that such a clause would kick in if he voluntarily leaves his job or is terminated due to misconduct or the like by him, not in a situation where the state is laying people off for budget cuts or other reasons beyond Mr. Green's control.

Finally, he is agreeable with Condition # 3.

At 11:59 a.m., Gina's attorney responded:

Since Mr. Green will solely be in control of when he retires, if he chooses not to retire at age 65, thereby prolonging Gina's receipt of retirement, Mr. Green will pay her monthly maintenance starting when he turns age 65 in the amount equal to what she would otherwise be receiving in retirement if he chose to retire at age 65. We just want to ensure Mr. Green does not remain employed so as to prevent Gina from getting maintenance.

I trust we have an agreement, and will await your confirmation of the same.

At 3:43 p.m., Thomas's attorney responded: "Mr. Green is agreeable with last proposal made (payment of spousal maintenance in the amount Ms. Green would have received when Mr. Green reaches age 65 in the event he decides to work beyond the age of 65 and delay receipt of retirement [benefits])." At 3:53 p.m., Gina's attorney responded that she would draft a property settlement agreement ("Agreement") consistent with the parties' negotiations. She requested that the parties meet at the courthouse the following morning, the scheduled trial

date, "to review paperwork and make any necessary changes." The parties notified the superior court before the close of business on June 12 that they had reached a settlement and would not proceed to trial the following day. The court ordered the parties to appear at 1:00 p.m. on June 13 for presentation of final orders.

At 8:25 p.m. on June 12, Gina's attorney sent Thomas's attorney an email containing a cover letter, a draft version of the Agreement, a final order of dissolution, and findings of fact and conclusions of law. The email read:

> I have attached the draft PSA for your review. Gina will be in at 8:30 a.m. tomorrow to review, so I reserve the right to make any changes she requests consistent with the agreement, but I wanted to get it to you for your review. I will follow up with you either way in the morning.

The Agreement and orders were all signed by both Gina and her attorney. The cover letter instructed: "If these orders meet your approval, please also execute where indicated." Gina's attorney requested that Thomas's attorney present the orders once signed "so neither party has to personally appear for presentation." The letter concluded: "Should you have any questions or concerns about the enclosed documents, please contact me."

The Agreement awarded maintenance to Gina in the amount of $2000.00 per month for the first five years, $1800.00 per month for years six through eight, and $1000.00 per month for years nine and ten. The Agreement provided that Thomas's maintenance obligation could not be modified for any reason. The Agreement awarded Gina a 50% share of Thomas's entire PERS 2 retirement account, including contributions made during the marriage as well as after the

parties' separation. It also awarded Gina 100% of the survivor benefit of both community and separate contributions.

> A. Division. Each party shall be awarded fifty percent (50%) of the husband's entire career benefit, which the parties acknowledge and intend to include all benefits accrued prior to and during the marriage, after the parties' separation, after entry of the Final Divorce Order and up to and through the time of the husband's final retirement.
>
> B. Creation of the Wife's Interest in the Husband's Account. The parties shall sign any and all documents necessary to create an equal interest for the wife in the husband's PERS Plan 2 account for the entirety of his career. The parties acknowledge the Washington State Department of Retirement Systems (DRS) and Washington State law mandate the language necessary to effectuate their agreement to create an interest for the wife.
> . . . .
> C. Former Spouse Survivor Benefit. The parties intend and agree that the wife shall be a Joint and 100% Survivor Beneficiary of the husband's PERS Plan 2 account as provided for by the Plan's Survivor Option 2 (Joint and whole allowance). When Thomas Green (the obligor) applies for retirement, the Department shall designate Gina Green (the obligee) as survivor beneficiary with an Option 2 survivor benefit.

Thomas's attorney did not see the documents until the following morning, June 13. At 10:03 a.m., he sent Gina's attorney an email disputing her representation of the parties' agreement regarding the PERS 2 account. He stated that Thomas agreed only to award Gina an equal share of the community portion of the PERS 2 account, and that Gina's survivor benefit would also be limited to the community portion. He did not intend to include retirement benefits earned after the date of separation. Nor did he intend that the maintenance payment be non-modifiable.

> In reviewing the proposed PSA there is an apparent fundamental misunderstanding regarding the division of Mr. Green's PERS Plan II account. The chart attached to your letter of May 31, 2017

referenced $3,350.87 which is the current marital benefit. As such Mr. Green understood that to mean the request was to divide the marital amount and that by creating an interest Ms. Green would receive the added benefit of future COLA's, along with any upward adjustment to his AFC, provided there is any. He was not and is not agreeable with Ms. Green receiving a benefit based on his entire career which could span another 20 years. As of now Ms. Green will be receiving an approximate 70/30 split on personal property, plus 10 years of maintenance, COLA's on the PERS II and 100% survivor benefit. Mr. Green would not be entitled to any of Ms. Green's post-divorce property and feels the same should go for Ms. Green when it comes to his post-divorce property.

I have not heard back from Mr. Green on the remainder of the PSA but wanted to bring this issue to your attention right away.

The parties appeared at the presentation hearing. Thomas and his attorney refused to sign the Agreement or the final orders, arguing that the documents did not accurately represent the parties' agreement.

On November 7, 2017, Gina moved to enforce the Agreement pursuant to CR 2A.[3] The court granted Gina's motion to enforce the Agreement, with the exception of the provision regarding the non-modification of maintenance, which the court found was not agreed to by parties. The court found that Thomas's June 9 email evidenced Thomas's intention to offer Gina a "future interest in his PERS II account in exchange for lower spousal maintenance." The court explained:

There was no mention about limiting it to the community portion of the PERS II account, but there is language regarding future efforts of Mr. Green and future contributions and withholdings, which is compelling to me and convinces me that that was the agreement that was reached.

The court denied Thomas's motion for reconsideration. Thomas appeals.

---

[3] In the meantime, Thomas scheduled another settlement conference for August 11, 2017. It appears this conference was unsuccessful.

ANALYSIS

CR 2A governs enforcement of a settlement agreement. It provides:

No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same.

Thus, CR 2A applies when (1) the agreement was made by the parties or their attorneys "in respect to the proceedings in a cause," and (2) the purport of the agreement is disputed. CR 2A; In re Marriage of Ferree, 71 Wn. App. 35, 39, 856 P.2d 706 (1993). An agreement is disputed for the purposes of CR 2A if there is a genuine dispute over either the existence or a material term of the agreement. In re Patterson, 93 Wn. App. 579, 583, 969 P.2d 1106 (1999)). Once the material terms are agreed upon, a party's remorse or second thoughts about the agreement are insufficient to show a genuine dispute. Lavigne v. Green, 106 Wn. App. 12, 19, 23 P.3d 515 (2001).

We review the decision to enforce a settlement agreement pursuant to CR 2A de novo, similar to our review of a summary judgment order. Condon v. Condon, 177 Wn.2d 150, 162, 298 P.3d 86 (2013). The party moving to enforce a settlement agreement carries the burden of proving there is no genuine dispute as to the material terms or existence of the agreement. Id. "If the moving party produces evidence that shows the absence of any genuine disputes, the nonmoving party must respond with affidavits, declarations, or other evidence to show there is a genuine issue of material fact." Patterson, 93 Wn. App. at 584. If the nonmoving party raises a genuine issue of material fact, a trial court abuses its

discretion if it enforces the agreement without first resolving such issues following an evidentiary hearing. Brinkerhoff v. Campbell, 99 Wn. App. 692, 697, 994 P.2d 911 (2000). The court must view the evidence in the light most favorable to the nonmoving party and determine whether reasonable minds could reach but one conclusion. Condon, 177 Wn.2d at 162.

General principles of contract law apply to settlement agreements. Cruz v. Chavez, 186 Wn. App. 913, 920, 347 P.3d 912 (2015). For a contract to form, the parties must manifest their mutual assent to be bound and the terms assented to must be sufficiently definite. Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 177-78, 94 P.3d 945 (2004). Washington follows the objective manifestation theory, in which a court determines the intent of the parties based on the objective manifestations of the agreement rather than the parties' subjective intent. Condon, 177 Wn.2d at 162. However, under the context rule, extrinsic evidence relating to the context in which a contract is made may be examined to determine the meaning of specific words and terms. Hearst Comm'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 502, 115 P.3d 262 (2005). Extrinsic evidence includes the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties. Id.

An informal writing, such as letters or emails, may be "sufficient to establish a contract even though the parties contemplate signing a more formal written agreement" in certain circumstances. Morris v. Maks, 69 Wn. App. 865, 869, 850 P.2d 1357 (1993). In determining whether an informal writing is sufficient to

establish a contract even though the parties contemplate signing a more formal written agreement, Washington courts consider whether (1) the subject matter has been agreed upon, (2) the terms are all stated in the informal writings, and (3) the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract. Id. (citing Loewi v. Long, 76 Wn. 480, 484, 136 P. 673 (1913)).[4]

The main source of contention between the parties in terms of whether an enforceable settlement agreement was reached was the treatment of Thomas' PERS 2 retirement account. PERS 2 plan members receive as retirement benefits two percent of the employee's average final compensation. RCW 41.40.620. "Average final compensation" for PERS 2 plan members is the employee's average compensation for the "highest consecutive sixty months of service credit months prior to such member's retirement, termination, or death." RCW 41.40.010(6)(b).

A dissolution order may divide a PERS retirement account in one of two ways. WAC 415-02-500. The account may be split into two separate accounts, or the non-employee spouse may be awarded an interest in the employee's account. WAC 415-02-510; 520. In the event that an interest is created, the order may limit the non-employee spouse's share to a percentage of the service credit earned

---

[4] It is arguable whether the series of letters and emails constituted a contract. Gina's final June 12 email informed Thomas that the Agreement was merely a draft and she was entitled to make changes even after sending it:

> I have attached the draft PSA for your review. Gina will be in at 8:30 a.m. tomorrow to review, so I reserve the right to make any changes she requests consistent with the agreement, but I wanted to get it to you for your review. I will follow up with you either way in the morning.

Because the parties do not explicitly raise this issue, and it is unnecessary to the resolution of this appeal, we do not address it.

during the marriage.  WAC 415-02-500(15); <u>See also</u> <u>In re Marriage of Bulicek</u>, 59 Wn. App. 630, 639, 800 P.2d 394 (1990) (method used by courts to calculate the community share of a pension is by dividing the number of months of marriage by the total months of service and multiplying that by the monthly benefit at the time of retirement); <u>In re Marriage of Chavez</u>, 80 Wn. App. 432, 437, 909 P.2d 314 (1996) ("[I]ncreases in pension benefits based on a retiree's higher salary at the time of retirement should be included in the community share.").  Even so, the non-employee spouse's share will reflect any salary increases or cost of living adjustments occurring after the marital period.  <u>See</u> https://www.drs.wa.gov/publications/member/multisystem/propertyDivision.htm

Considering the objective and the circumstances surrounding the formation of the agreement, we hold that the agreement does not objectively manifest a mutual intent that Thomas and Gina would equally share in Thomas's career retirement benefits.  Both Gina's pre-settlement conference letter and her initial May 31 settlement offer assumed an expected retirement benefit of $3350.87 per month.  This was the value of Thomas's PERS 2 account as of November 13, 2016, the date of separation, and did not include post-dissolution contributions.  This indicates that Gina was seeking an equal share of the community portion of the PERS 2 account.  At no time did Gina explicitly assert she was seeking an equal share of Thomas's career retirement benefits.

As did the court below, Gina points to the language in Thomas's June 7 email, in which Thomas states: "If things go as planned Ms. Green would receive a benefit from the 20 years of post-divorce efforts of Mr. Green, in addition to

receiving the survivor benefit which Mr. Green could not then provide to any future spouse." Gina also cites Thomas's June 9 email stating that she would "receive just as much benefit as Mr. Green from any future contributions/withholdings." Gina contends that these statements show Thomas was offering her an equal share of his career retirement benefit in exchange for lower maintenance payments for the first five years. She argues that "[t]he only way Gina receives 'just as much benefit as Mr. Green' is if she receives a benefit equal to Mr. Green's benefit, which is one-half of his career accumulation."

We reject Gina's claim. As discussed above, because the parties agreed Gina would be granted an interest in Thomas's account, Gina would benefit from any salary increases or cost of living adjustments occurring after the marital period, even if her share was derived only from the community portion of the benefits.

Moreover, the parties' conduct demonstrates a lack of mutual assent as to the terms. As soon as Thomas reviewed the Agreement, he realized it did not accurately reflect his offer to Gina. This was not a case in which Thomas merely had second thoughts about the offer. Cf. Morris, 69 Wn. App. 867-68 (court appropriately enforced settlement agreement when one party attempted to back out after receiving advice about negative tax consequences to the settlement); Lavigne, 106 Wn. App. at 16 (a party's change of mind regarding the sufficiency of the settlement amount does not make the settlement agreement disputed within the meaning of CR 2A).

Because the evidence viewed in the light most favorable to Thomas raises a genuine issue of material fact as to the terms of the Agreement, the court erred

in enforcing the agreement pursuant to CR 2A. We reverse the order granting Gina's motion to enforce, and remand for further proceedings.

Both parties request attorney fees pursuant to RAP 18.1 and RCW 26.09.140. In determining whether a fee award is appropriate under RCW 26.09.140, we consider both the parties' relative ability to pay and the arguable merit of the issues raised on appeal. In re Marriage of Fiorito, 112 Wn. App. 657, 670, 50 P.3d 298 (2002). RAP 18.1(c) requires that, where applicable law mandates consideration of a party's financial resources, a party requesting fees submit a financial affidavit "no later than 10 days prior to the date the case is set for oral argument or consideration on the merits." Neither party timely filed a financial affidavit as required. "An appellate court will not consider an award of attorney fees on appeal under RAP 18.1 and RCW 26.09.140 when a party seeking fees fails to comply with RAP 18.1(c)." In re Marriage of Crosetto, 82 Wn. App. 545, 565–66, 918 P.2d 954 (1996). Accordingly, we deny both parties' requests for attorney fees on appeal.[5]

Reversed and remanded.

WE CONCUR:

---

[5] Consistent with this opinion, we also decline Gina's request for attorney fees pursuant to the fee provision of the Agreement.

15