1998 SD 71

**John GUILFORD, Plaintiff and Appellant,**

v.

**NORTHWESTERN PUBLIC SERVICE, a South Dakota corporation, Defendant,**

and

**Dakota Pork Industries, Inc., a South Dakota corporation, and Mark Heuston, an individual, Defendants and Appellees.**

**Nos. 20155, 20165.**

Supreme Court of South Dakota.

Argued April 27, 1998.

Decided July 1, 1998.

Thomas M. Tobin of Tonner, Tobin and King, Aberdeen, for plaintiff and appellant.

Sandra Hoglund and Edwin E. Evans, Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and appellees Dakota Pork and Heuston.

AMUNDSON, Justice.

[¶ 1.] Employee brought suit against employer for slander and defamation when employer conveyed information about employee to a prospective employer. The prospective employer rescinded an offer of employment as a result. The trial court granted summary judgment for the employer. Employee appeals. We affirm.

## FACTS

[¶ 2.] In 1983 John Guilford accepted a job with Swift Packing, which subsequently became Dakota Pork. Guilford was still employed by Dakota Pork in 1992 when he became interested in seeking a position as a welder with Northwestern Public Service (NWPS). After attending classes at Mitchell Vo–Tech, Guilford was granted an interview with NWPS officials. At the end of February or beginning of March, 1993, Guilford was notified that he would be hired upon passage of a drug test and physical.

[¶ 3.] On or about March 31, 1993, Guilford gave notice to Dakota Pork that he would be quitting his job. However, on April 2, 1993, Guilford was notified by NWPS that the offer of employment had been withdrawn. Dakota Pork then allowed Guilford to withdraw his termination notice and he kept his same job, salary, and benefits.

[¶ 4.] Guilford then found out about a conversation that took place between Mark Heuston, Dakota Pork's personnel director, and Terry White, NWPS's personnel director. Heuston called White and informed him of what Heuston viewed as Guilford's problems with alcohol abuse, attendance, sleeping at work, and domestic abuse. Based on this information, NWPS had made the decision to rescind the offer of employment to Guilford.

[¶ 5.] Guilford brought suit against Dakota Pork, alleging, among other things, that the statements made by Mark Heuston were slanderous and caused Guilford damage. The trial court granted summary judgment to Dakota Pork, finding no genuine issues of material fact and dismissing Guilford's complaint. Among other reasons for the dismissal, the trial court found that Guilford admitted that the allegedly slanderous re-

marks by Heuston were true. Guilford appeals, raising the following issues:

1. Whether there were issues of fact that precluded summary judgment on the issues of defamation and slander.

2. Whether a conversation between officials of the two employers was privileged so as to defeat a claim of slander or defamation.

3. Was there an issue of fact as to whether or not Heuston acted with malice in initiating contact with Guilford's prospective employer and making what Guilford argues are false statements.

## STANDARD OF REVIEW

[¶ 6.] Our standard of review for summary judgment has been clearly established as follows:

"In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied[.]"

*Walz v. Fireman's Fund Ins. Co.,* 1996 SD 135, ¶ 6, 556 N.W.2d 68, 70 (quoting *Lamp v. First Nat'l Bank of Garretson,* 496 N.W.2d 581, 583 (S.D.1993)). When reviewing a grant of summary judgment, we must undertake an independent review of the record. *Id.* (citation omitted). "The burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *Kern v. City of Sioux Falls,* 1997 SD 19, ¶ 4, 560 N.W.2d 236, 237 (citing *State Dep't of Revenue v. Thiewes,* 448 N.W.2d 1, 2 (S.D.1989)).

## DECISION

### [¶ 7.] 1. Defamation and Slander

[¶ 8.] Defamation consists of either libel or slander. SDCL 20–11–2. Slander is defined as

a false and unprivileged publication ... which ... [t]ends directly to injure [a person] in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit[.]

SDCL 20–11–4 (in pertinent part). Thus, truthful statements clearly do not amount to slander. *Id.; see, e.g., Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195–96 (8th Cir.1994) (summary judgment for union appropriate when its statements could not reasonably be read to be false assertions of fact); *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996); *Johnson v. Dirkswager*, 315 N.W.2d 215, 219 (Minn.1982); *Meier v. Novak*, 338 N.W.2d 631, 635 (N.D.1983). "The truth of a defamatory statement is measured by the ordinary implication of the words at the time the statement was made...." 53 C.J.S. *Libel and Slander* § 108 at 194 (1987).

[¶ 9.] The trial court found that Guilford had basically admitted his way out of court on the issue of defamation because of his answers under oath in his deposition. Also, the trial court noted that Guilford did not specifically point out in his affidavit, submitted in resistance to the motion for summary judgment, in what respect Heuston's remarks to White were false.

[¶ 10.] Our review of the record shows that Guilford did directly admit in his deposition many of the things that he considers slanderous. As to his work attendance, Guilford stated the following in his deposition when asked if he had any problems with tardiness: "About the only time I've ever really had too much trouble with tardiness was when I was going to school, otherwise I'd miss maybe a couple days sick a year,

maybe [be] late a couple times a year, but otherwise no big problem." Later in his deposition, Guilford admitted "[w]hen I was going to school and getting two and a half hours of sleep a day, I was sick a lot." On the issue of spousal abuse or domestic problems Guilford stated:

My second ex-wife and I in—I believe it was '87 or '88 went to some counseling for that reason. It probably was 1988. We both went to counseling, there was some abuse earlier in our relationship, I can't say that our relationship got any better after that, but there was no physical abuse after that, those counseling—we still had a lot of verbal and mental abuse, we just didn't get along, but there wasn't any physical abuse after that, that was in 1988.

In response to whether he had ever been caught sleeping on the job, Guilford replied that he had not, but elaborated as follows:

I worked nights when I was going to school, it was extremely trying going to school and working out at the plant. I came in an hour before the usual shift did, they usually came in from 11 to 7:30, I came in at 10 o'clock because I had to be on the road so I could get to school on time. Somewhere around 1:30 to 2 o'clock, in that area, the night shift takes a break. When I—when that break was taken, I usually would sit back in the chair and take a nap. They'd wake me up and away we'd go.... And all the other employees knew this too—or the maintenance guys, you know, I tell them, hey, I'm going to take my break, I'm going to be in the locker room and I'm going to lay down, which I've got woke up by different people while I was on my break, you know, a few times. Finally, they got—they knew, he's taking his break, leave him alone. But as far as being reprimanded for sleeping on the job, no, I had never been. Mark Heuston came up to me one time and asked me about it, and I at that time, explained to him, hey, I'm taking my half hour break, you know, just like everybody else, he didn't say anything other than that, he just left it alone.

Guilford also was asked about his alcohol use and he responded as follows:

I would probably say I was—say that I was guilty of very infrequent alcohol abuse, by drinking more than what you really needed to, but very infrequently.... [T]here was no ongoing problem, an isolated situation one time or another might have caused a little problem, but it was not a long term thing....

[¶ 11.] In sum, Guilford's general complaint about Heuston's statements was that they were exaggerations. Guilford compared the whole situation to the telling of stories that are 5% true and 95% untrue. However, when asked what he thought was untrue about Heuston's statements, Guilford only contested the issue of whether or not he had a drinking problem. However, as the previous testimony set out above reveals, he admitted that he was "guilty of very infrequent alcohol abuse." Guilford did not explain what was false about the allegations of domestic abuse and absenteeism from work.

[¶ 12.] Guilford cannot now rely on a better version of the facts than the one he adhered to during his own deposition testimony. *Petersen v. Dacy*, 1996 SD 72, ¶ 16, 550 N.W.2d 91, 95. Even viewing the evidence in a light most favorable to Guilford, he had a duty to present "specific facts showing that a genuine, material issue for trial exists." *Walz*, 1996 SD 135, ¶ 6, 556 N.W.2d at 70 (citation omitted). The party opposing a motion for summary judgment must "be diligent in resisting the motion, and mere general allegations and denials which do not set forth specific facts will not prevent issuance of a judgment." *Hughes–Johnson Co. v. Dakota Midland Hosp.*, 86 S.D. 361, 364, 195 N.W.2d 519, 521 (1972); *see also Specialty Mills v. Citizens State Bank*, 1997 SD 7, ¶ 27, 558 N.W.2d 617, 625. However, Guilford did not address in his responsive affidavit what it is that he asserts to be false about the statements made by Heuston to White.

Guilford's affidavit is replete with conclusory statements, but does not point out the basis for any genuine issues of material fact. Furthermore, Guilford cannot create issues of material fact by contradicting his own earlier sworn testimony. *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 503 (S.D.1990) (citation omitted). Therefore, the trial court is affirmed.

[¶ 13.] Because of our holding on issue one, we need not address the remaining issues.

[¶ 14.] MILLER, C.J., and KONENKAMP and GILBERTSON, JJ., concur.

[¶ 15.] SABERS, Justice, concurs specially.

SABERS, Justice (concurring specially).

[¶ 16.] I agree that the order granting summary judgment should be affirmed on the basis that there are no genuine issues of material fact concerning Guilford's defamation cause of action.

[¶ 17.] I write specially to state that I regard Mark Heuston's conduct deplorable and inexcusable. Heuston obviously did not view Guilford as an unfit employee—on the contrary, he rehired him for the same job, salary, and benefits just as soon as he succeeded in ruining Guilford's plan to change employment.

[¶ 18.] Notwithstanding the fact that Heuston's conduct did not constitute defamation under these circumstances, there are genuine issues of material fact whether his conduct constituted tortious interference with Guilford's relationship with NWPS.* Unfortunately for Guilford, that part of the order granting summary judgment was not appealed.

---

* *See Landstrom v. Shaver*, 1997 SD 25, ¶ 73, 561 N.W.2d 1, 16: "We recognized the cause of action of tortious interference with business relationships or expectancies in *Tibke v. McDougall*, 479 N.W.2d 898 (S.D.1992). Therein we held the plaintiff must prove the following essential elements to prevail on her claim:

1. the existence of a valid business relationship or expectancy;
2. knowledge by the interferer of the relationship or expectancy;
3. an intentional and unjustified act of interference on the part of the interferer;
4. proof that the interference caused the harm sustained; and,
5. damage to the party whose relationship or expectancy was disrupted."

(Citing *Tibke*, 479 N.W.2d at 908).