2000 SD 124

**Reuben C. SETLIFF, III, M.D., P.C., Plaintiff and Appellant,**

v.

**Robert AKINS, M.D. and Great Plains Sinus Care, P.C., and Randall L. Stewart, Defendants and Appellees,**

and

**Reuben C. Setliff, M.D. and Micki Schmidt, Additional Defendants.**

Nos. 21023, 21041.

Supreme Court of South Dakota.

Argued Jan. 12, 2000.

Decided Sept. 6, 2000.

Mark E. Salter and Kent R. Cutler of Cutler, Donahoe & Mickelson, Sioux Falls, for plaintiff and appellant.

Steven W. Sanford, Karen A. Leonard, and Michael A. Henderson of Cadwell, Sanford, Deibert & Garry, Sioux Falls, for defendants and appellees Great Plains Sinus Care.

Mark V. Meierhenry and Clint L. Sargent of Danforth, Meierhenry & Meierhenry, Sioux Falls, for defendant and appellee Randall Stewart.

SABERS, Justice.

[¶ 1.] In Issue 1, Dr. Reuben Setliff (Setliff) appeals the trial court's granting of summary judgment to Dr. Robert Akins (Akins) and Great Plains Sinus Care (Great Plains) on his claims for breach of contract, breach of duty of loyalty, unfair

competition, conspiracy, and enforcement of a loan obligation. Setliff also appeals the granting of summary judgment in favor of Randall Stewart (Stewart) on the claims of interference with business expectancy and conspiracy. In Issue 2, Setliff appeals the denial of summary judgment on Akins' counterclaim for libel. In Issue 3, Akins appeals the granting of summary judgment on his breach of contract claim against Setliff. We affirm Issue 2 and reverse and remand Issues 1 and 3.

## FACTS

[¶ 2.] In early 1997, Akins, a practicing board-certified otolarynologist[1] in Salt Lake City, Utah, met Setliff at a continuing medical education course in Twin Falls, Idaho. Akins informed Setliff that he was anxious to leave his current practice and join another. Setliff discussed with Akins that he had his own practice in Sioux Falls, South Dakota. In addition, Setliff indicated the prospect of Akins moving to Sioux Falls to join Setliff's clinic (Clinic).

[¶ 3.] Akins traveled to Sioux Falls in February of 1997. On February 16, Akins and Setliff discussed several issues relating to Akins' potential employment with Setliff. Akins orally agreed to begin working with Setliff on April 21, 1997. During the negotiations between Akins and Setliff, Setliff made promises in twenty-seven different areas. Setliff wrote down in his notes all twenty-seven topics which were discussed with Akins. Prior to moving to Sioux Falls, Akins had intended to live in a home owned by Setliff, but the home sold just prior to Akins' move. Akins had found a home to purchase, but did not have enough money for the down payment. Stewart, a consultant for Clinic, approached Setliff about Atkins' situation and Setliff agreed to provide Akins with $7,000 to be applied to his house down payment.

[¶ 4.] Stewart contacted Jean Bender (Bender), an attorney at the firm of Davenport, Evans, Hurwitz & Smith in Sioux Falls, South Dakota, to have a draft of Akins' employment contract prepared. The employment contract had not been finalized when Akins began work at Clinic on April 21. Stewart ultimately left his position as consultant for Clinic in May 1997 without ever finalizing a written employment agreement for Akins.

[¶ 5.] Within one to two months after joining Clinic, Akins became dissatisfied and began contemplating leaving Clinic to start his own practice. Akins continued working with Setliff for approximately nine months without a written contract ever being finalized. Finally, on January 13, 1998, approximately nine months after Akins received the first draft of his employment contract, he received the second draft. Craig Bosdorf, a consultant hired by Clinic, sent Akins the second draft which contained terms substantially different from those terms discussed in February of 1997. Akins refused to sign the second draft due to its drastic differences from the oral agreement in February 1997.

[¶ 6.] Akins' dissatisfaction at Clinic continued and he again contemplated leaving to start his own practice. He had never received a production bonus,[2] no written employment contract had been signed, and the tension level in the office was extremely high due to the constant conflict between Setliff and his paramour/clinic coordinator, Micki Schmidt (Schmidt). Akins was also informed by Stewart that Schmidt had been circulating false rumors that Akins was having an affair with a medical assistant.

---

1. An otolaryngologist deals with the ears, nose, and throat. Webster's New Collegiate Dictionary 813 (1974).

2. The production bonus would have allowed Akins to receive a bonus after generating a specified level of revenue for the clinic. Apparently, the key to receiving the bonus is not the quality of the patient care, but the quantity of revenue generated.

[¶ 7.] In January 1998, Akins discussed with Stewart the possibility of leaving Clinic. After these discussions, Akins decided to leave and start his own practice. Akins began meeting with prospective lenders to discuss financing his new business. Stewart assisted Akins in the formation of his new clinic. Akins incorporated his new clinic, Great Plains, on February 11, 1998. On February 17, Akins delivered copies of his resignation letter to Setliff and several administrative employees of Clinic.[3]

[¶ 8.] Following Akins' resignation from Clinic, patients contacted Clinic asking why Akins was no longer working there. In March 1998, Setliff drafted and mailed a letter explaining Akins' departure from Clinic to patients in Sioux Falls and Dakota Dunes, South Dakota. Dr. Peter Doble of Twin Falls, Idaho, and Dr. Jim Denninghoff of Columbia, Missouri, also swore by affidavit that they had received copies of the letters sent from Setliff to his patients; however, how or from whom they received the letter was not disclosed.

[¶ 9.] On April 7, 1998, Setliff brought suit against Akins and Great Plains claiming breach of employment contract, breach of fiduciary and loyalty duties, unfair competition, interference with business relations, conversion, and conspiracy. Setliff also brought action against Stewart for wrongful interference with business relations, wrongful interference with a contract and civil conspiracy. Akins and Great Plains brought counterclaims against Setliff and Schmidt, alleging breach of employment contract and libel. All parties moved for summary judgment or partial summary judgment. After a

hearing, the trial court granted summary judgment to Akins, Great Plains, and Stewart on all of Setliff's claims. In addition, the court granted partial summary judgment to Setliff on Akins' breach of contract claim and his third-party claim alleging vicarious liability for defamatory statements made by Schmidt. Setliff appeals, raising the following issues:

1. Did the trial court err in granting summary judgment against Setliff on all of his claims.

2. Did the trial court err in denying Setliff's motion for summary judgment on Akins' libel claim.

Akins also appeals raising the following issue:

3. Did the trial court err in granting summary judgment to Setliff on Akins' counterclaim for breach of employment contract.

### STANDARD OF REVIEW

[¶ 10.] Our standard of review for summary judgment is settled and briefly is " 'whether a genuine issue of material fact exists and whether the law was correctly applied.' " *Manuel v. Wilka*, 2000 SD 61, ¶ 17, 610 N.W.2d 458, 462 (quoting *Parmely v. Hildebrand*, 1999 SD 157, ¶ 7, 603 N.W.2d 713, 715–16 (citations omitted)).

[¶ 11.] **1. WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST SETLIFF ON HIS CLAIMS AGAINST AKINS AND STEWART.**

*A. Breach of Employment Contract*

[¶ 12.] The trial court held that no employment contract existed between

---

**3.** Akins' resignation letter to Setliff states in pertinent part:

Reuben,

. . . .

Out of respect for you and in the interest of patient continuity of care I will offer my continued professional services for the next thirty days with the following stipulation. I expect my month's salary paid in advance and $1500 per surgery performed payable

weekly. This still leaves you a generous profit margin and will allow a smoother transition for Setliff Clinic.

If this is of interest to you I will expect written confirmation within twenty four hours. Failing this will be taken as a negative response and I will consider my association with Setliff Clinic terminated.

. . . .

Sincerely, Robert A. Akins

Setliff and Akins, and therefore no breach could have occurred. This was error. SDCL 53–1–3 provides that "[a] contract is either express or implied. An express contract is one, the terms of which are stated in words. An implied contract is one, the existence and terms of which are manifested by conduct." We defined an implied contract in *Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 841 (S.D. 1991):

'A contract is implied in fact where the intention as to it is not manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction.'

(quoting *Mahan v. Mahan*, 80 S.D. 211, 215, 121 N.W.2d 367, 369 (1963)).

[¶ 13.] In determining whether an implied contract exists, this court held that "[t]he pertinent inquiry is whether the facts and circumstances properly evaluated permit an inference that services were rendered in expectance by one of receiving and the other of making compensation." *Mahan*, 80 S.D. at 215, 121 N.W.2d at 369. Clearly, this is the situation here. Furthermore, the " 'facts are viewed objectively and if a party voluntarily indulges in conduct reasonably indicating assent he may be bound even though his conduct does not truly express the state of his mind.' " *Weller*, 477 N.W.2d at 841 (quoting *Federal Land Bank of Omaha v. Houck*, 68 S.D. 449, 463, 4 N.W.2d 213, 219–20 (1942)). Therefore, we must closely examine the course of conduct between the parties. The " '[c]onduct' can be both acts and words. By its very nature, an implicit agreement is not as detailed as a written agreement formally negotiated." *In re Estate of Regennitter*, 1999 SD 26, ¶ 12, 589 N.W.2d 920, 924 (quoting *Jurrens v. Lorenz Mfg. Co.*, 1998 SD 49, ¶ 9, 578 N.W.2d 151, 154 (quoting *Mathews v. Twin City Const. Co., Inc.*, 357 N.W.2d 500, 507 (S.D.1984))). "We look to the totality of the parties' conduct to learn whether an implied contract can be found." *Id.* (citations omitted). *See also Lien v. McGladrey & Pullen*, 509 N.W.2d 421, 423–24 (S.D.1993) (providing that an implied contract is inferred from the conduct of the parties).

[¶ 14.] Here, the totality of the parties' conduct reasonably indicates assent that the parties intended to be bound by the terms of an implied contract. Akins began working at the Setliff Clinic on April 21, 1997 and delivered a copy of his resignation letter to Setliff on February 17, 1998. During those ten months, specific terms of employment existed, under which Akins received: an annual salary, a comprehensive benefits package, malpractice insurance, reimbursement for moving expenses, permission to use Setliff's airplane for personal purposes and a leased 1997 Ford Expedition. These terms were indicated in the notes Setliff took during employment negotiations with Akins. That there may be disputed claims of additional terms is immaterial to summary judgment and simply a matter for the jury to determine in due course. These parties not only negotiated in good faith, but they obviously reached an agreement and an intention to contract; otherwise, Akins would not have reported to work at the Setliff Clinic on April 21, 1997. Once there is an agreement on the terms of the contract, " 'a contract is formed even though [the parties] intend to adopt a formal document with additional terms at a later date.' " *Kroupa v. Kroupa*, 1998 SD 4, ¶ 39, 574 N.W.2d 208, 214 (Konenkamp, Justice, concurring in part and concurring in result) (citations omitted). "Even when parties change their minds between the time of oral agreement … and when it is to be reduced to writing, the [contract] is nonetheless binding." *Id.* ¶ 40. Obviously, an implied contract can be inferred from the circumstances presented here. *See St. John's First Lutheran Church v. Storsteen*, 77 S.D. 33, 37, 84 N.W.2d 725, 727 (1957) (stating that the distinction be-

tween express and implied contracts is "the way in which mutual assent is manifested.").

[¶ 15.] More compelling, however, is the admission made by Akins in his answer and counterclaim: "in April 1997 [Akins] became an employee of [Setliff] and that some of the terms alleged in IV and VI were terms of the employment contract between [Setliff] and Dr. Akins." *See Simons v. Kidd*, 73 S.D. 306, 309, 42 N.W.2d 307, 308 (1950) (stating that "no evidence is required to establish a fact conceded by [the] answer."). The basis of Akins' counterclaim is that Setliff breached the existing employment contract. Therefore, because both parties agreed in their pleadings that an employment contract existed, there is an unmistakable intention by both sides to be bound by an employment contract. Therefore, it is nonsensical to conclude that there was no "meeting of the minds" between the parties to contract. *See In re Estate of Eberle*, 505 N.W.2d 767, 770 (S.D.1993) (providing that a contract is enforceable when it is possible to "ascertain the full meaning with *reasonable certainty;* ... *absolute certainty* is not required." (citations omitted)).

[¶ 16.] This issue is wholly inappropriate for summary disposal.

B. Breach of Duty of Loyalty

[¶ 17.] Pursuant to South Dakota law, all employees have a statutory duty of loyalty: "[a]n employee who has any business to transact on his own account, similar to that entrusted to him by his employer, must always give the latter the preference." SDCL 60–2–13. Whether an employee's actions constitute a breach of this duty is a question of fact to be determined by a jury. *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 305 (Minn.Ct.App.1987).

[¶ 18.] While the lack of resistance may be material, the standard of review is whether genuine issues of material fact exist within the record.

[¶ 19.] In reviewing these types of cases in other jurisdictions, it is obvious that they are extremely fact-sensitive. It is clear, however, that the employee owes a duty of loyalty to the employer, and the employee must not, while employed, act contrary to the employer's interests. Equally clear is the proposition that the employee is entitled to make "arrangements" for some new employment by a competitor and should be given some latitude in this regard. *See* Restatement (Second) of Agency § 393 cmt. e (1957) (providing that "[e]ven before the termination of the agency, [the employee] is entitled to make arrangements to compete, ... however, [he is not] entitled to solicit customers for such rival business before the end of his employment [or] do other similar acts in direct competition with the employer's business."). Therefore, while employees may lay plans and take limited steps to begin competing with their employers, employees who go too far risk violating their duty of loyalty. We acknowledge, as others have, that " 'the line separating mere preparation from active competition may be difficult to discern in some cases.' " *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 493 (Colo.1989) (recognizing the "competing policy considerations of honesty and fair dealing on the one hand and free and vigorous economic competition on the other") (quoting *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 569 n.3 (1978)). At any rate, it is clearly a jury question.

[¶ 20.] Obviously, " '[i]t is the nature of [the employee's] preparations which is significant' in determining whether a breach has occurred." *Id.* (quoting *Bancroft–Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921, 935 (1966)). In *Bushman v. Pure Plant Food Intern., Ltd.*, 330 N.W.2d 762, 763–64 (S.D.1983), this court was presented with a similar fact situation. The parties had an employment relationship, but did not have a written agreement setting forth the duration

or a non-competition clause. The three employees, while employed for employer, discussed the formation of a competing business and solicited interest, from employer's customers and employees, in their new business venture. In upholding the jury award to employer for breach of duty of loyalty, this court stated:

> Although SDCL 60–2–13 does not flatly prohibit employees from pursuing their own interests, it does require an employee to prioritize. *An employee must prefer his employer's business interests to his own.*

*Id.* at 764 (emphasis added). We also examined a Rhode Island case, which held that "pretermination solicitation of an employer's customers is a breach of loyalty to the employer." *Id.* at 765 (citing *Rego Displays, Inc. v. Fournier,* 119 R.I. 469, 379 A.2d 1098 (R.I.1977) (other citations omitted)).

[¶ 21.] Here, Setliff alleges that Akins breached his duty of loyalty by:

1. Utilizing for his own benefit knowledge and information which Setliff had specially trusted to him ...;

2. Conducting business activities on his own account while in the employ of Setliff, and with the knowledge acquired from Setliff worked to establish his own medical clinic in competition with Setliff;

3. Appropriating and taking advantage of business opportunities that rightfully belonged to Setliff;

4. Secretly communicating with, *soliciting* and/or hiring *employees* of Setliff while still employed by Setliff; and

5. Secretly communicating with or *soliciting patients* of Setliff while still employed with Setliff.

(emphasis added).

[¶ 22.] At the time of Akins' deposition, Great Plains employed three assistants, two of which were previously employed at the Setliff Clinic. Akins testified that he told at least one of the assistants that he could not legally offer her a job, but that he was leaving an opening in his practice.[4] He also testified that fifteen percent of his clientele consisted of Setliff Clinic patients. *See A & L Scientific Corp. v. Latmore,* 265 A.D.2d 355, 696 N.Y.S.2d 495, 496 (1999) (stating that " '[a]n employee may solicit an employer's customers only when the employment relationship has been terminated.' " (quotations omitted)). This evidence was presented to the trial court which, without explanation, granted summary judgment. However, whether Akins went too far in preparing to compete with Setliff and whether he solicited Setliff Clinic employees and customers are questions of fact. *See Paint Brush Corp. v. Neu,* 1999 SD 120, ¶ 34, 599 N.W.2d 384, 393 (determining that a question of fact existed whether the employee breached his duty of loyalty); *Rehabilitation Specialists, Inc.,* 404 N.W.2d at 305 (stating that "[w]hether an employee's actions constituted a breach of h[is] duty of loyalty is a question of fact to be determined based on all the circumstances of the case.").

## C.   Unfair Competition

[¶ 23.] Setliff brought an unfair competition claim to recover damages allegedly caused by Akins' unexpected notice of his intention to leave the Setliff Clinic and to start his own competing business.

[¶ 24.] The tort of unfair competition does not have specific elements. Instead, "it describes a general category of torts which courts recognize for the protection of commercial interests." *Id.* at 305–06 (citations omitted). Therefore, damages for unfair competition results from satisfying the elements of an underly-

---

4. Whether the co-workers of Akins were at-will employees, "is not dispositive of the breach of duty of loyalty analysis." *Jet Courier,* 771 P.2d at 498. In fact, contrary to the dissent, an at-will employee can have an implied contract with his employer on other terms.

ing tort. *See United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632 (Minn.1982) (providing that tortious interference with contract or improper use of trade secrets can be the basis for a claim for unfair competition).

[¶ 25.] "An employee's breach of his duty of loyalty may constitute unfair competition." *Rehabilitation Specialists*, 404 N.W.2d at 306 (citing *Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 112 N.W.2d 42, 49 (1961) (characterizing defendant's conduct in soliciting his employer's customers and failing to give sufficient notice of his intention to quit as "unfair competition"); *Loxtercamp, Inc. v. Belgrade Co-op Ass'n.*, 368 N.W.2d 299, 301 (Minn.Ct.App.1985) (stating that plaintiff "would normally be entitled to such relief as would mitigate the consequences of [defendant's] unfair competition, i.e., the solicitation of several customers prior to his resignation.")). Because genuine issues of material fact exist whether Akins breached his duty of loyalty to Setliff resulting in unfair competition, the granting of summary judgment on unfair competition must also be reversed and remanded.

*D. Loan Obligation*

[¶ 26.] Setliff sued for recovery of a $7,000 loan to Akins. Setliff argues that he had an implied contract with Akins for repayment of this loan.

[¶ 27.] It is indisputable that a promissory note was not entered into between these parties. However, as previously stated, an implied contract may be inferred from the parties' conduct and the surrounding circumstances. *Jurrens*, 1998 SD 49, ¶ 9, 578 N.W.2d at 154 (citation omitted). The existence of an implied contract, as well as its terms, are questions of fact to be determined by a jury. *Id.* (citations omitted). Even if there were no implied contract, Akins would be liable to Setliff on *quantum meruit* for $7,000.

[¶ 28.] In order to create a contract, four elements must exist: (1) the parties must be capable of contracting; (2) they must consent; (3) the purpose for contracting must be lawful; and (4) there must be sufficient cause or consideration. SDCL 53–1–2. An implied contract must satisfy all four of these elements, however, additional elements are not imposed on implied contracts just because they are not in writing. *See Phegley v. Phegley*, 629 N.E.2d 280, 282 (Ind.Ct.App.1994) (upholding the trial court's finding that a loan for $80,000 existed on an implied contract theory); *Cole v. Cole*, 517 N.E.2d 1248, 1250 (Ind.Ct.App.1988) (providing that "where there is no express contract, the right to recover may rest upon implied contract or implied promise to pay," which may be inferred from the parties' conduct, situation, or relationship and enforced by law).

[¶ 29.] Setliff argues that this money was "loaned" to Akins and Akins argues that it was a gift. "The essential elements of a gift are intent, delivery and acceptance." *Meyer v. South Dakota Dep't of Social Services*, 1998 SD 62, ¶ 12, 581 N.W.2d 151, 155 (citations omitted). No intent to make a gift is present here. In determining whether a transaction is a loan or a gift, "the trial court may take into consideration the relationship of the parties and an individual's need for the loan." *Saum v. Moenter*, 101 Ohio App.3d 48, 654 N.E.2d 1333, 1335 (1995) (citations omitted). Additionally, it can deliberate " 'whether in view of their relations a loan might be made without being evidenced by a note and any other incidents that would enable one to infer that the transaction constituted a loan[.]' " *Id.* (quotation omitted).

[¶ 30.] In viewing the facts in a light most favorable to Setliff, no one can seriously claim that he possessed the requisite donative intent to gift $7,000 to Akins. Obviously, this presents a question of fact. This is elementary! Therefore, this issue is reversed and remanded.

*E. Civil Conspiracy*

[¶ 31.] Setliff sued both Akins and Stewart for civil conspiracy. The trial court concluded that because there was no employment contract, Setliff's cause of action against Akins for civil conspiracy fails.

[¶ 32.] In order to establish a prima facie case of civil conspiracy, a plaintiff must prove:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds on the object or course of action to be taken;

(4) the commission of one or more unlawful overt acts; and

(5) damages as the proximate result of the conspiracy.

In re *TMJ Implants Prods. Liab. Litigation*, 113 F.3d 1484, 1498 (8th Cir.1997) (citations omitted). This is not an independent cause of action, but is " 'sustainable only after the underlying tort claim has been established.' " [5] *Hanten v. School District of Riverview Gardens*, 183 F.3d 799, 809 (8th Cir.1999) (quoting *K & S Partnership v. Continental Bank*, 952 F.2d 971, 980 (8th Cir.1991)).

[¶ 33.] Clearly, a jury could determine that Akins breached his duty of loyalty. If so, "this finding would satisfy the unlawful act element of the civil conspiracy definition[.]" *Jet Courier*, 771 P.2d at 502, and is also reversed.

*F.* Interference with Business Relations

[¶ 34.] Setliff sued both Akins and Stewart for interference with business relations. Summary judgment was granted to both Akins and Stewart. Although Setliff did not appeal the granting of summary judgment to Akins, he did appeal the summary judgment to Stewart.

[¶ 35.] The elements for this cause of action are:

(1) the existence of a valid business relationship or expectancy;

(2) knowledge by the interferer of the relationship or expectancy;

(3) an intentional and unjustified act of interference on the part of the interferer;

(4) proof that the interference cause[d] the harm sustained; and

(5) damage to the party whose relationship or expectancy was disrupted.

*Hayes v. Northern Hills General Hosp.*, 1999 SD 28, ¶ 18, 590 N.W.2d 243, 248 (citations omitted). Notably, none of these elements require the existence of an *express* employment contract.[6] In fact, we stated that " '[f]or this tort to occur, the business relationship ... need not be cemented by written or verbal contract and, ... it need not be intended that there be a contract.' " *Id.* ¶ 17 (quoting 45 Am.Jur.2d *Interference* § 50 (1969)).

[¶ 36.] " 'One is liable for commission of this tort [if he] interferes with business relations of another, *both existing and prospective*, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another.' " *Id.* ¶ 22 (emphasis added) (quoting *Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.*, 83 Mich.App. 84, 268 N.W.2d 296, 299 (1978)). Thus, a "valid business relationship or ex-

---

5. The dissent correctly points out that "[t]he existence of a contract is not a requisite to proving conspiracy." However, it goes on to conclude that summary judgment is appropriate because "no 'underlying tort claim' exists to serve as the basis for Setliff's conspiracy action."

6. The dissent concludes that summary judgment was appropriate for this issue because in order " 'to establish a 'valid business rela-

tionship or expectancy,' there [has] to be a showing of a 'contract or business relationship' between the plaintiff and an identifiable third party.' " (quoting *Landstrom v. Shaver*, 1997 SD 25, ¶ 75, 561 N.W.2d 1, 16). It further determines that because an at-will employment relationship existed between Setliff and Akins, "there was no valid business relationship to be interfered with[.]" The dissent misses the point.

pectancy" must exist with a third party. *Landstrom,* 1997 SD 25, ¶ 75, 561 N.W.2d at 16. In other words, "there must be a 'triangle' – a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." *Id.*

[¶ 37.] Here, a business relationship existed between the plaintiff (Setliff) and the third party (Akins). As previously discussed, an implied contract can be inferred from the parties' conduct and the surrounding circumstances. However, one does not need to conclude that a contract, express or implied, existed because their "business relationship" of employer and employee is sufficient to satisfy the first element. *See Hayes,* 1999 SD 28, ¶ 17, 590 N.W.2d at 248 (stating that " 'the business relationship . . . need not be cemented by written or verbal contract and, . . . it need not be intended that there be a contract.' " (quotation omitted)).

[¶ 38.] Second, Stewart was employed as an independent consultant for Setliff at the time Akins was hired. In fact, he was responsible for securing a written employment agreement between Setliff and Akins. Obviously, Stewart was aware of the business relationship between Setliff and Akins.

[¶ 39.] Third, Setliff claims that Stewart "intentionally and unjustifiably interfered with this relationship by persuading Akins that Setliff Clinic was not a suitable employer and that Setliff somehow lacked sufficient moral character to be worthy of Akins' employment." He further claims that Stewart encouraged Akins to leave the Setliff Clinic and start his own practice. In fact, the record reveals that Stewart leased office space to Akins, became the principal stockholder of Akins' company, Great Plains Clinic, and even secured a "lucrative" consulting agreement with Great Plains Clinic.

[¶ 40.] Fourth, Setliff claims that there was no indication that Akins would have left his Clinic had it not been for the actions of Stewart. Although Akins testified that he was unhappy at the Setliff Clinic long before he left, there are genuine issues of material fact concerning his leaving and the timing of his leaving.

[¶ 41.] Finally, Setliff claims that, as a result of Akins unexpected resignation, his level of patient care was jeopardized because his physician staff was reduced by half. He also contends that the good will of the Setliff Clinic has been tarnished because of the inconvenience caused to his patients.

[¶ 42.] Clearly, sufficient evidence exists to establish genuine issues of material fact: (1) whether Stewart intentionally interfered with Akins' employment at the Setliff Clinic; (2) whether Akins would have resigned absent Stewart's interference; (3) whether Setliff experienced economic damage from Akins' resignation; and (4) the extent thereof. Therefore, this issue is reversed and remanded.

[¶ 43.] **2. DID THE TRIAL COURT ERR IN DENYING SETLIFF'S MOTION FOR SUMMARY JUDGMENT ON AKINS' LIBEL CLAIM.**

[¶ 44.] Under SDCL 20–11–2, defamation consists of either libel or slander. *Guilford v. Northwestern Pub. Serv.,* 1998 SD 71, ¶ 7, 581 N.W.2d 178, 180. Under South Dakota law, "both libel and slander are defined as 'unprivileged' communications." *Kieser v. Southeast Properties,* 1997 SD 87, ¶ 13, 566 N.W.2d 833, 837 (citing SDCL 20–11–3, –4). Privilege may always be raised as a defense in a defamation action. *Id.* (citing *Sparagon v. Native Am. Publishers, Inc.,* 1996 SD 3, ¶ 25, 542 N.W.2d 125, 132). A privileged communication is statutorily defined as a communication made in one of the following ways:

(1) In the proper discharge of an official duty;

(2) In any legislative or judicial proceeding, or in any other official proceeding authorized by law;

(3) In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information;

(4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

In the cases provided for in subdivisions (3) and (4) of this section, malice is not inferred from the communication or publication.

▬▬▬▬ *Id.* (quoting SDCL 20–11–5). There are two types of privileges under SDCL 20–11–5. *See Bego v. Gordon,* 407 N.W.2d 801, 811 (S.D.1987); *Hackworth v. Larson,* 83 S.D. 674, 683, 165 N.W.2d 705, 709 (1969). Subsections (1) and (2) are considered absolute, unconditional privileges. *See Hackworth,* 83 S.D. at 683, 165 N.W.2d at 709. Additionally, subsections (3) and (4) are considered conditional, qualified privileges and may be lost if the speaker publishes the statement when he either (a) in fact does not believe it to be true, or (b) has no reasonable grounds to believe it to be true. *See Bego,* 407 N.W.2d at 811.

[¶ 45.] In the present case, Akins filed a counterclaim against Setliff for libel[7] based upon alleged defamatory statements written by Setliff in a letter[8] to patients of Clinic; therefore, Akins has the burden of proving that Setliff made a "false and unprivileged publication." *See Miessner v. All Dakota Ins. Associates, Inc.,* 515 N.W.2d 198, 203–04 (S.D.1994) (citing SDCL 20–11–3, –4). The trial court denied summary judgment because issues of fact existed on the defamation claim in the letter.

[¶ 46.] Setliff contends that no defamation was committed based upon "qualified and conditional privilege" under SDCL 20–11–5(3). He argues that he "believed, in good faith and with good reason, that Setliff Clinic's patients had a right to know of Akins' departure, and Setliff never entertained serious doubt as to the truth of the letter's content." In support of his argument, Setliff cites *Tibke* and Restatement (Second) of Torts § 596. Under the Restatement section, the common interest privilege applies where "persons having a common interest in a particular matter correctly or reasonably believe that there is information that another sharing the common interest is entitled to know." *Tibke,* 479 N.W.2d at 905 (citing Restatement (Second) Torts § 596).

▬▬▬▬ [¶ 47.] In addressing "conditional privileges" under SDCL 20–11–5, we have previously noted:

An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is in-

---

**7.** Under SDCL 20–11–3, "libel" is defined as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

**8.** Setliff"'s letter is as follows:

Dear Valued Patient:
As a patient in the Setliff Clinic–Sinus Specialist you deserve to know of recent developments concerning my former associate, Dr. Bob Akins. After nearly ten months of an agreed-upon twelve month employment arrangement, he recently resigned without notice to me or patients under his care. If you were under his care and feel you deserve an explanation, you have that in common with me. Leaving is his prerogative – leaving without notice is harder to understand. Perhaps, as seems to be everyone's explanation for the unexpected nowadays, El Nino has struck again. Our best wishes go with Dr. Akins and his family.

. . . .

Sincerely, Reuben C. Setliff III, M.D.

formation that another sharing the common interest is entitled to know. *Kieser*, 1997 SD 87, ¶ 14, 566 N.W.2d at 837. This court has also stated that "[t]he privilege created by SDCL 20–11–5(3) is a qualified privilege in that a 'communication is only "privileged" if it is made "without malice.'" *Id.* Under the statute, "'[m]alice cannot be presumed; the party bearing this burden of proof must establish that there was a *reckless disregard for the truth on the part of the accused.*'" *Ruple v. Weinaug*, 328 N.W.2d 857, 860 (S.D. 1983) (emphasis added). "'The real test of whether a defendant's conduct is reckless so as to constitute actual malice is whether he in fact entertained serious doubts as to the truth of his publications.'" *Kieser*, 1997 SD 87, ¶ 15, 566 N.W.2d at 838.

[redacted] [¶ 48.] This record reveals conflicting evidence as to whether a privilege exists and whether Setliff exceeded any privilege by mailing his letter to *all* patients of Setliff's clinic and by the receipt of the letter by two doctors practicing in Idaho and Missouri. Additionally, conflicting evidence exists in this case as to whether Setliff published the letter with "a reckless disregard for the truth." A review of the record reveals that it is undisputed that Akins provided a letter of resignation to Setliff identifying the reasons for his departure. The record also reveals that the letter from Akins to Setliff was not read by Setliff.[9] Thus, Setliff's own deposition raises genuine issues of material fact as to whether his refusal to read the letter and subsequent mailing of a letter to his patients without reading Akins' letter constituted a "reckless disregard for the truth." The trial court did not err in denying summary judgment on this issue.

**[¶ 49.] 3. WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST AKINS ON HIS CLAIM FOR BREACH OF EMPLOYMENT CONTRACT.**

[¶ 50.] As determined in Issue 1(A), "[t]he existence and governing terms of any implied contract present questions of fact to be decided by a jury." *Jurrens*, 1998 SD 49, ¶ 9, 578 N.W.2d 151, 154 (citations omitted). Therefore, the trial court clearly erred in granting summary judgment against Akins on his claim for breach of employment contract and this issue must also be reversed and remanded.

[¶ 51.] We affirm Issue 2 and reverse and remand Issues 1 and 3.

[¶ 52.] MILLER, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 53.] AMUNDSON and GILBERTSON, Justices, dissent on Issues 1 and 3.

9. Setliff answered questions by Akins' counsel as follows:

Q: (Mr. Sanford) Ever seen [Akins' resignation letter] before?
A: (Setliff): No.
Q: No one ever showed it to you?
A: I was told it was available. I had no desire to read a document from someone who leaves under these circumstances. None. Zero. No interest. None whatsoever.
Q: Did anybody explain to you its content?
A: Let me explain something. The answer to that is no because I had no interest in the content. There is no, no justification. Nothing. There is nothing that would justify leaving patients high and dry. There is nothing, nothing, no insult, nothing that would justify leaving patient care suspended. I have no interest in this document. None. And unless I'm made to I won't read it because there's nothing in this document which can possibly justify a precipitous, without notice departure....

....

Q: All right. So you did your work at the Sioux Falls Surgical Center. When you were done did you make any attempt to contact Dr. Akins and find out what was going on?
A: No interest. You have to understand that. I don't know how to make it any clearer....
Q: So the answer is no, you had no discussion with him?
A: The answer is that I did not and will not. Those are the answers.

AMUNDSON, Justice (dissenting on Issues 1 and 3).

[¶ 54.] Because there is no genuine issue of material fact, I dissent. I believe all of Setliff's claims are deserving of summary judgment, therefore, I will address each claim individually.

### a. Breach of Employment Contract

[¶ 55.] Our initial inquiry is whether a valid contract was entered between Akins and Setliff. It is undisputed that no written employment contract existed between the parties. Setliff argues, however, that an express contract exists based upon the oral agreement made by the parties on February 16, 1997. In the alternative, Setliff argues that an implied contract existed based upon the conduct of the parties. The trial court disagreed and held that no employment contract existed; therefore, Akins was an at-will employee. In the summary judgment hearing, the trial court stated:

> This case has generated an awful lot of paper, but most of the issues get after what the nature of the contract between the parties – and the only thing that could be even halfway construed as a written contract would be the notes of Dr. Setliff. That means an oral contract and even for an oral contract, *there has to be a meeting of minds. There has to be an offer and acceptance and terms and in this case there are not, so there is employment at will.* Under South Dakota law, and under 60–4–4 employment at will may be terminated at any time by either party. Whether or not a notice was appropriate or professional is not the issue that we have to deal with today. It's whether or not it meets the standards of South Dakota law. So I'm going to find that this was employment at will, and there was no term of employment other than that because no agreement was ever reached by a meeting of the minds of the parties. (Emphasis added.)

[¶ 56.] Despite an ever-increasing number of challenges, South Dakota still follows the employment-at-will doctrine. *See Merritt v. Edson Express, Inc.,* 437 N.W.2d 528, 529 (S.D.1989); *Stedillie v. American Colloid Co.,* 767 F.Supp. 1502, 1506 (D.S.D.1991). In fact, the doctrine has been codified under SDCL 60–4–4, which provides that "[a]n employment having no specified term may be terminated at will of either party on notice to the other, unless otherwise provided by statute." *See* SDCL 60–4–4 (1993). We have often noted that "when there is no employment contract or specified term of employment, and an employer has no established procedures for discharging employees, the employment is terminable at the will of the employer under SDCL 60–4–4." *Larson v. Kreiser's, Inc.,* 472 N.W.2d 761, 762–63 (S.D.1991) (citing *Hopes v. Black Hills Power & Light Co.,* 386 N.W.2d 490 (S.D. 1986); *Tombollo v. Dunn,* 342 N.W.2d 23 (S.D.1984)). *See also* Jane Wipf Pfeifle & Steven J. Helmers, *The Evolving Boundaries of the At–Will Employment Doctrine in South Dakota: Defining the Need for Broader Exceptions,* 38 S.D.L.Rev. 273 (1993) (discussing South Dakota's application and adoption of the employment-at-will doctrine and the exceptions created by case law).

[¶ 57.] The essential elements of a contract are set forth at SDCL 53–1–2. *See Paint Brush Corp. v. Neu,* 1999 SD 120, ¶ 36, 599 N.W.2d 384, 393. The statute provides:

> Elements essential to existence of a contract are:
> (1) Parties capable of contracting;
> (2) Their consent;
> (3) A lawful object; and
> (4) Sufficient cause or consideration.

*Id.* (quoting SDCL 53–1–2). In satisfying the essential terms of the contract, there must be a meeting of the minds. *See Amdahl v. Lowe,* 471 N.W.2d 770, 778 (S.D.1991) (Henderson, J., concurring in result). *See also Geraets v. Halter,* 1999 SD 11, ¶ 16, 588 N.W.2d 231, 234 (noting

that an agreement between the parties is the result of a " 'mutual assent of two parties to certain terms' "); *Ahlers Bldg. Supply, Inc. v. Larsen,* 535 N.W.2d 431, 435 (S.D.1995) (finding no evidence of mutual assent).

[¶ 58.] Setliff contends that even though their informal agreement on February 16, 1997, was not reduced to writing, it does not mean that the parties did not intend for a contract to exist. In support of his argument, Setliff cites G.*H. Lindekugel & Sons, Inc. v. Brezina Construction Co., Inc.,* 83 S.D. 404, 408–09, 160 N.W.2d 121, 123 (1968). In *Lindekugel,* this Court stated:

> Whether an informal agreement, which is to be thereafter reduced to writing, takes effect as a complete contract at once or when it is so reduced to writing depends on the intention of the parties as construed from the facts and circumstances.

*Id.* (quoting *Larson v. Western Underwriters, Inc.,* 77 S.D. 157, 161, 87 N.W.2d 883, 885 (1958)). Setliff claims that he and Akins both unequivocally established their intent to contract, as shown by Akins' admission that he believed himself to be bound to work for Setliff's clinic and his comment that "his first year period of employment ... ended on April 21, 1998." I disagree.

[¶ 59.] In reviewing Setliff's notes from the February 16, 1997, meeting with Akins, twenty-seven areas were discussed, including: an annual salary of $200,000, a production bonus to be calculated beginning at $170,000 of revenue generated, the leasing of a home owned by Setliff, family health insurance, reimbursement for moving expenses, free use of Setliff's airplane, and a leased 1997 Ford Expedition. The first draft of the employment contract, which Stewart had prepared by Bender on April 8, 1997, contained terms unsatisfactory to the parties and it was ultimately rejected. The second draft, which was completed approximately nine months later, contained terms extremely different from the negotiated terms on February 16, 1997, and the first employment contract draft; that draft was also rejected. The differences in the second draft included: (1) the term of employment was to start in January 1998, notwithstanding Akins' presence in the clinic during the previous eight months; (2) no provision for the promised production bonus from 1997; (3) a reduction in Akins' annual salary from $200,000 to $180,000; (4) the production bonus revenue amount was raised from $170,000 to $400,000; (5) a noncompete provision was included; (6) the clinic was no longer obligated to provide Akins' health, dental or retirement plans; and (7) a confidentiality provision was included.

[¶ 60.] A review of this record clearly shows that under these facts and circumstances, there was no meeting of the minds that the terms discussed at the February 16 meeting would constitute an enforceable agreement. " 'An agreement is the result of a mutual assent of two parties to certain terms, and, if it be clear that there is no consensus, what may have been written or said becomes immaterial.' " *Geraets,* 1999 SD 11, ¶ 16, 588 N.W.2d at 234 (quoting *Watters v. Lincoln,* 29 S.D. 98, 100, 135 N.W. 712, 713 (1912) (citation omitted)). Additionally, " '[c]onsent is not mutual unless the parties all agree upon the same thing in the same sense.' " *Id.* (quoting SDCL 53–3–3). Both employment contract drafts, which were prepared at the instruction of Setliff, were of such varying degree from the February 16, 1997 pre-employment negotiation between Setliff and Akins that it clearly reflects there was no mutual understanding between the parties that the informal agreement would constitute an express contract to take effect immediately. It is important to note that "[i]f the written draft [of a contract] is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the

written draft is finally signed." 17A Am. Jur.2d *Contracts* § 38. Based upon the differences between the negotiation and the terms of the employment contract drafts, it is clear that Setliff did not intend the employment contract drafts to constitute a "convenient memorial or record" of the negotiated terms, but rather, a continuation of the negotiation; therefore, no contract exists.

[¶ 61.] Setliff also argues that the yearly salary and comprehensive benefits package provided to Akins are relevant in determining that a contract exists. In support of this claim, Setliff cites SDCL 60–1–3, which provides that "[t]he length of time which an employer and employee adopt for the estimation of wages is relevant to a determination of the term of employment." In addition, Setliff cites *Goodwyn v. Sencore, Inc.*, 389 F.Supp. 824, 828 (D.S.D. 1975), in support of his position. In *Goodwyn*, the court was faced with a situation involving a new employee who had left his previous employer to work for Sencore in Sioux Falls, South Dakota. The parties had discussed salary of $15,000 in the pre-employment negotiations. On Goodwyn's first day of employment, he was approached with a "trial period form" which he was required to sign or not get paid. The trial period form placed Goodwyn on a four-week trial period before being granted permanent employment with Sencore. Goodwyn argued that no "trial period" was ever discussed with him during negotiations. The court held that based upon this lack of discussion on the "trial period," "it can hardly be argued that there has been a mutual consent to the modification of the prior contract." *Id.* at 828. Despite the lack of mutual consent, the court found that an employment contract for a definite specified period of one year did exist. The court based its ruling on SDCL 60–1–3. In 1975, the statute stated:

> A servant is presumed to have been hired for such length of time as the parties adopt for the estimation of wages. A hiring at a yearly rate is

presumed to be for one year; a hiring at a daily rate, for one day; a hiring by piece work, for no specified term.

*Id.* (emphasis added).

[¶ 62.] Setliff's reliance on *Goodwyn* is misplaced. The *Goodwyn* court's determination that a one-year contract existed based upon the promise of payment at "one year at the rate of $15,000" was grounded upon the *presumption* under SDCL 60–1–3. In 1985, the statute was amended to state only that "[t]he length of time ... is *relevant*." SDCL 60–1–3 (emphasis added). The statute no longer provides for a presumption between estimation of wages and length of employment. The amount of wages is now only one of the relevant factors in determining whether a contract exists. As we previously noted, no express contract existed based upon the lack of mutual assent by the parties.

[¶ 63.] Setliff's final argument is that if there is no express contract, then an implied employment contract exists. Setliff notes that " '[a]n implied contract is one, the existence and terms of which are manifested by conduct.' " *See Mathews v. Twin City Const. Co., Inc.*, 357 N.W.2d 500, 507 (S.D.1984). Additionally, Setliff contends that "[w]hether a contract is formed is determined by the objective conduct of the parties." *See Geraets*, 1999 SD 11, ¶ 17, 588 N.W.2d at 234 (quotation omitted). This Court has previously noted that,

> There is no distinction in legal effect between an express contract and an implied contract. *An implied contract is a true contract and must contain all the elements of an express contract.* The distinction between them is in the way in which mutual assent is manifested. In an express contract the terms are stated by the parties. In an implied contract they are inferred from the circumstances.

*St. John's First Lutheran Church v. Storsteen*, 77 S.D. 33, 37, 84 N.W.2d 725, 727 (1957) (citation omitted) (emphasis added).

As we previously discussed, a review of the record reflects that despite the negotiations between Setliff and Akins on February 16, 1997, the parties were never able to come to an agreement regarding the terms of their employment contract. We have often noted:

> If it appears that any of the terms of the [contract] are left open to be settled by future negotiation between [the parties] " 'there is not complete agreement; the minds of the parties have not fully met; and, until they have, no court will undertake to give effect to those stipulations that have been settled, or to make an agreement for the parties respecting those matters that have been left unsettled.' "

*Deadwood Lodge No. 508 v. Albert,* 319 N.W.2d 823, 826 (S.D.1982) (quoting *Engle v. Heier,* 84 S.D. 535, 537, 173 N.W.2d 454, 456 (1970) (citation omitted)). Based upon Setliff's employment contract drafts, it is evident a "meeting of the minds" was lacking to create an implied contract. Therefore, since no express or implied contract for a specified term existed, the trial court did not err in finding that Akins was an employee-at-will.

### b. Breach of Duty of Loyalty

[¶ 64.] Setliff next claims Akins violated his duty of loyalty to Setliff by planning and researching the formation of his own clinic. Under SDCL 60–2–13, "[a]n employee who has any business to transact on his own account, similar to that entrusted to him by his employer, must always give the latter the preference." Setliff contends that while still an employee of Clinic, Akins did the following:

(1) accumulated the necessary financial information to present to prospective lenders;

(2) met with bankers in mid-to-late January 1998 to discuss financing for his new business;

(3) directed or allowed Stewart to purchase office furniture and equipment in January 1998; and

(4) sought legal assistance with the formation of his new business and incorporated Great Plains.

As a result of this conduct, Setliff argues that Akins has preferred his own interests to those of his employer, Clinic, and has violated his duty of loyalty.

[¶ 65.] The trial court held that "[t]here was no showing that other than looking at starting in practice there was any contact with any patients, anything to interfere with practice." We have previously held that SDCL 60–2–13 "does not flatly prohibit employees from pursuing their own interests," it does, however, require an employee to prioritize. *Bushman v. Pure Plant Food Int'l, Ltd.,* 330 N.W.2d 762, 764 (S.D.1983). In addition, "[a]n employee must prefer his employer's business interests to his own." *Id.*

[¶ 66.] Under SDCL 15–6–56(e), "the opposing party [must] be diligent in resisting a motion for summary judgment, and mere general allegations and denials which do not set forth specific facts will not prevent the issuance of a judgment." *Hughes–Johnson Co., Inc. v. Dakota Midland Hosp.,* 86 S.D. 361, 364, 195 N.W.2d 519, 521 (1972) (citing *Liberty Leasing Co. v. Hillsum Sales Corp.,* 380 F.2d 1013 (5th Cir.1967); *Engl v. Aetna Life Ins. Co.,* 139 F.2d 469 (2d Cir.1943)). In reviewing this record, Setliff failed to submit any data showing that Akins interfered with his obligations to Clinic, competed with Clinic while he was still an employee, solicited customers away from Setliff, or usurped potential customers away from Clinic, other than his own conclusory allegations that it happened and that is insufficient. Therefore, the trial court did not error in granting summary judgment.

### c. Loan Obligation

[¶ 67.] Setliff next contends that the trial court erred in granting summary judgment on his action to recover the $7,000 he paid to Akins for the down payment on his house. Setliff argues that this "advance"

constitutes a loan and is an enforceable implied contract between them. The trial court granted summary judgment to Akins based upon Setliff's failure to prove any "terms or basis of the loan."

[¶ 68.] In *Werner v. Norwest Bank South Dakota*, 499 N.W.2d 138, 140 (S.D. 1993), Werner sued Norwest Bank for breach of an oral promise to loan money. The trial court granted summary judgment in favor of Norwest Bank. *Id.* On appeal, this Court held that "[w]here there is no showing that the terms of an alleged oral agreement were ever settled or agreed upon, the trial court is proper in granting summary judgment." *Id.* at 141 (citing *Deadwood Lodge*, 319 N.W.2d at 826 (citing *Engle*, 84 S.D. 535, 173 N.W.2d 454)).

[¶ 69.] Setliff adamantly contends that the $7,000 he gave to Akins for his down payment constituted an implied loan contract; however, other than the amount, Setliff fails to cite any other terms of this "implied loan contract." Setliff does not specify any other essential terms, such as: interest rate, term, security, time and method of repayment, closing date, or the preparation and execution of written documents. Setliff has provided no evidence that any of these terms were ever settled, agreed upon, or even discussed. As we noted in *Werner*, "[w]here there was no understanding as to the ... interest rate, time and method of repayment, and no exchange of documents, no enforceable contract can be said to exist." 499 N.W.2d at 142 (citations omitted). Setliff has failed to present specific facts to establish that a genuine, material issue of fact exists regarding the existence of a loan obligation; therefore, the trial court did not err in granting summary judgment.

### d. Civil Conspiracy

[¶ 70.] Setliff commenced a civil conspiracy action against both Akins and Stewart alleging that they conspired to commit the following: 1) breach Akins' duty of loyalty; 2) unfairly compete against Setliff's clinic; and 3) interfere with the business relationship and breach his employment contract. The trial court granted summary judgment on this issue based upon "no contract" existing.

[¶ 71.] To establish a cause of action for civil conspiracy in South Dakota, Setliff must prove the following elements:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds on the object or course of action to be taken;

(4) the commission of one or more unlawful overt acts; and

(5) damages as the proximate result of the conspiracy.

In re *Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1498 (8th Cir.1997).

[¶ 72.] The existence of a contract is not a requisite to proving conspiracy. Instead, Setliff must show that Akins and Stewart "committed one or more unlawful overt acts." [10] In *K & S Partnership v. Continental Bank*, 952 F.2d 971, 980 (8th Cir. 1991) (citations omitted), the Eighth Circuit Court of Appeals noted that "[c]ivil conspiracy requires an agreement to participate in an unlawful activity and an overt act that causes injury, so it 'do[es] not set forth an independent cause of action' but rather is 'sustainable only after the underlying tort claim has been established.'" A review of this record reflects that no "underlying tort claim" exists to serve as the basis for Setliff's conspiracy action.

[¶ 73.] We have often noted that "it is a well entrenched rule of this Court that, where a judgment is correct, it will not be reversed even though it is based on erroneous conclusions or wrong reasons."

---

**10.** An "overt act" is defined as "[a]n open, manifest act from which criminality may be implied. An outward act done in pursuance and manifestation of an intent or design." Black's Law Dictionary 1104 (6th Ed. 1990).

*Wolff v. Secretary of South Dakota Game, Fish & Parks Dep't.*, 544 N.W.2d 531, 537 (S.D.1996) (citing *Sommervold v. Grevlos*, 518 N.W.2d 733, 740 (S.D.1994); *Kirby v. Western Surety Co.*, 70 S.D. 483, 488, 19 N.W.2d 12, 14 (1945)). Further, " 'summary judgment will be affirmed if there exists *any* basis which support the trial court's ruling.' " *Id.* (quoting *St. Paul Fire & Marine Ins. v. Schilling*, 520 N.W.2d 884, 886 (S.D.1994)) (emphasis in original). While the trial court may have erroneously based its summary judgment on the "lack of any contract," the court properly granted summary judgment on this issue.

### e. Interference with Business Relations

[¶ 74.] Setliff also commenced an action solely against Stewart for interference with business relations. The trial court granted summary judgment to Stewart on this issue based upon Setliff's failure to prove the existence of a valid business relationship. The trial court opined that "there was not a contract. There was not a business relationship to be interfered with other than employment at will."

[¶ 75.] To establish a prima facie claim for interference with business expectancy, the following elements must be satisfied:

(1) the existence of a valid business relationship or expectancy;

(2) knowledge by the interferer of the relationship or expectancy;

(3) an intentional and unjustified act of interference on the part of the interferer;

(4) proof that the interference caused the harm sustained; and

(5) damage to the party whose relationship or expectancy was disrupted.

*Hayes v. Northern Hills Gen. Hosp.*, 1999 SD 28, ¶ 18, 590 N.W.2d 243, 248 (citing *Case v. Murdock*, 1999 SD 22, ¶ 12, 589 N.W.2d 917, 919; *Communication Tech. Sys., Inc. v. Densmore*, 1998 SD 87, ¶ 24, 583 N.W.2d 125, 131). *See also Tibke v. McDougall*, 479 N.W.2d 898 (S.D.1992) (recognizing the cause of action of tortious interference with business relationships or expectancies).

[¶ 76.] "[T]o establish a 'valid business relationship or expectancy,' there [has] to be a showing of a 'contract or business relationship' between the plaintiff and an identifiable third party." *Landstrom v. Shaver*, 1997 SD 25, ¶ 75, 561 N.W.2d 1, 17 (quoting *Tibke*, 479 N.W.2d at 908–09). I believe that the employment relationship between Setliff and Akins was an at will relationship, there was no valid business relationship to be interfered with under (1) above. *See Densmore*, 1998 SD 87, ¶ 25, 583 N.W.2d at 131 (finding no interference with an at-will business relationship because "the business relationship ... [was] not within the realm of protection afforded by this cause of action"). *See also Defco, Inc. v. Decatur Cylinder, Inc.*, 595 So.2d 1329, 1332 (Ala.1992) (finding no basis existed for allowing an action for intentional interference under the circumstances of this case and Defco failed to show that the employees were anything other than employees-at-will).

[¶ 77.] There was no error in granting summary judgment on this issue.

[¶ 78.] Likewise, because no genuine issue of material fact exists as to the finding of no contract, summary judgment by the trial court was proper. The trial court granted summary judgment to Setliff on this issue based upon its prior decision that no contract existed. Because I agree with the trial court that no contract existed, I dissent on Issues 1 and 3.

[¶ 79.] GILBERTSON, Justice, joins this dissent.